Hugh KELLY, d/b/a Kelly Real Estate, Respondent,

v.

Truman CRAIGMILES and Minnie Craigmiles, Appellants.

No. 54908.

Supreme Court of Missouri, Division No. 1.

Dec. 14, 1970.

James J. Wheeler, Keytesville, for respondent.

Frith & Pyatt, Robert F. Pyatt, Somerville, Cleaveland & Macoubrie, David P. Macoubrie, Chillicothe, for appellants.

WELBORN, Commissioner.

Action for real estate broker's commission for producing purchaser of real estate offered for sale by defendants. Judgment for plaintiff for $22,931.25 on jury verdict. Defendants appeal.

Plaintiff Hugh Kelly is a licensed real estate broker (Chapter 339, RSMo 1969, V.A.M.S.) with an office in Moberly. Defendants Truman Craigmiles and his wife Minnie listed their farm in Livingston County with Kelly. The Craigmileses fixed a price of $375 per acre for their approximately 1,223 acres and specified a down payment of 25% of the purchase price.

As a result of advertising by Kelly in a Chicago publication, Glenn Isringhausen, who owned and farmed land in the vicinity of Jerseyville, Illinois, came to Kelly's office in the spring of 1967. Isringhausen was interested in buying farm land in Missouri and Kelly showed him the Craigmiles farm sometime in April. Isringhausen met Craigmiles and talked about the farm. Isringhausen made an offer to Craigmiles for less than the price Craigmiles was asking, but Craigmiles insisted on his asking price. Isringhausen told Craigmiles that he would be back.

At either the first or a subsequent meeting of Kelly, Isringhausen and Craigmiles, Isringhausen told Craigmiles that he had approximately 600 acres of land in Illinois on which he was obtaining a loan of $115,-000 from the John Hancock Insurance Com-

pany. He told Craigmiles that he could not meet the one-fourth down payment, but that he could offer $20,000 down, with a second lien on his Illinois farms to secure an $80,000 balance on the down payment, to be paid in five annual $16,000 payments. This offer interested Craigmiles to the extent that he and Kelly went to Illinois to look at Isringhausen's property. Isringhausen was not home when they came, but his daughter showed them the property.

After viewing the Illinois property, Craigmiles told Kelly to get Isringhausen to come over, that he was willing to make the deal.

At around 9:00 A.M. on Sunday, May 7, 1967, Mr. and Mrs. Isringhausen, Mr. and Mrs. Craigmiles and Kelly met at the Craigmiles farm. The transaction was discussed. Mr. Craigmiles made handwritten memoranda, stating the price of the land at $459.750, and computed the price of livestock, machinery, equipment, supplies and growing crops at $27,347. These items were to be included in the sale.

Using these memoranda, Kelly used a blank printed form of contract which he filled in, producing a document which read as follows (italicized portions are in Kelly's hand; remainder printed on form):

## "CONTRACT

"This Contract, Made and entered into this *6th* day of *May,* 19*67,* by and between *Truman Craigmiles & Minnie Craigmiles* of the County of *Livingston* and the State of *Missouri,* party of the first part, and *Glenn Isringhausen and Emma Isringhausen* of *Jerseyville, Ill.,* party of the second part:

"WITNESSETH, That for and in consideration of second party keeping and performing the covenants hereinafter made on his part and making the payments hereinafter specified to be made by him, the first party hereby sells and agrees to convey, or cause to be conveyed, to the second party by general warranty deed, and to furnish

abstract on modern form showing marketable title of record thereto, the following described land lying, being and situated in the County of *Livingston* and State of Missouri, to-wit: *Commonly known as the Truman Craigmiles farms being 1223 acres more or less and lying between Sampsel Station and 3½ miles west of Sampsel Station, lying in 3 tracts of approximately 137 acres, 540 acres and 546 acres. Legal description to be inserted and made a part hereof.*

for the price and sum of *Four Hundred Fifty Nine Thousand Seven Hundred* Fifty Dollars, *$459,750.00.*

"The second party agrees to pay to the first party *Three Thousand* Dollars, *$3,000.00,* on the date of this contract, receipt of which amount is hereby acknowledged, and to complete the payment for said land in the manner following, to-wit: *$17,000.00 to be paid on or before August 6, 1967. Seed, chemical sprays, hay, 76 head of cattle, plowing, unharvested wheat, salt and all equipment pertaining to raising cattle now on premises to be included and made a part hereof for an additional $27,347.00. Said $27,347.00 is to be paid in 3 equal payments, payable annually plus interest at the rate of 6%. 1st payment due December 15, 1967. $16,000.00 to be paid annually in 5 equal payments plus interest at the rate of 6% per annum on unpaid balance of $80,000.00 down payment. $359,750.00 to be amortized over a period of 20 years including interest at the rate of 6% per annum, 1st payment on down payment and annual payment on loan to be due and payable January 15, 1968. In case of proven hardship, payment of annual payment may be delayed 60 days. 5% of price of farm to be paid to Kelly's Realty by Sellers as per agreement. Purchasers to give Sellers a lien on ½ crops harvested from farms until annual payment is made.*

"Possession is to be given on the _____ day of *Contract* _____, 19__. Abstract is be furnished not later than the *6th* day of *June,* 19*67,* and second party to have *15*

days in which to have it examined. Should any defects appear in abstract, first party shall have a reasonable time in which to cure same. Deed and deed of trust, if any, to be executed and delivered on the *21st* day of *June*, 1967. Taxes due and payable in 1967 and prior years to be paid by first

> "*Purchasers to give sellers 2nd lien on purchasers' 3 farms located near Fieldon, Ill., inferior to 1st lien to be given to John Hancock in the amount of $115,000.00 until down payment is made.*

party, those thereafter by second party. Should second party fail or refuse to carry out his agreements herein made, or make the payments specified to be made, this contract may be at once terminated by first party, and first party may keep the payments made as liquidated damages.

*Truman Craigmiles* /s/

*Minnie Craigmiles* /s/

*Glenn Isringhausen* /s/

*Emma Isringhausen* /s/

———◆———

The document was signed by the Craigmileses and the Isringhausens, with the understanding that on Tuesday the parties would go to the office of Mr. Robert Frith, an attorney in Chillicothe, and bring the legal description of the property owned by the parties and involved in the transaction, and Mr. Frith would prepare a document which could be recorded in order to evidence the transaction.

The Isringhausens left the farm at around 2:00 P.M. After they had gone, Mr. Craigmiles began to have misgivings about Isringhausen's ability to meet the payments called for. He also discovered errors in the computation of the price of the farm (favorable to himself) and of the stock and equipment. Mrs. Craigmiles called Mrs. Isringhausen on Sunday evening, apparently for the purpose of discussing these matters.

On Monday, Craigmiles went to Kelly's office and told him about his misgivings about Isringhausen's ability to handle the deal. A call was made to Isringhausen and also a Moberly banker, at Kelly's request, made a call to a Jerseyville banker to inquire about Isringhausen's financial status. According to Kelly, Craigmiles told him at that time that he was backing out of the deal.

On Tuesday morning, May 9, the five interested parties met at the Strand Hotel in Chillicothe. Isringhausen had with him a

$3,000 check payable to the Craigmileses. The parties disagreed as to exactly what happened at that time. According to Isringhausen, he tendered Craigmiles the $3,000 check and he "refused the deal," stating that he had decided not to sell the farm. Craigmiles' version was that no check was tendered, that he asked Isringhausen if they had considered what his wife had called them about Sunday night, that he told them: "I can't see how you folks can make this kind of a payment. I don't want to see you get in trouble. I think you are nice people. Why don't we go out at the farm and talk it over, and see if we cannot cut these payments down so you can handle them?" The parties did go to the farm and after a brief discussion there, Isringhausen and Kelly left and went to see the attorney who represented Kelly in this action which was filed September 18, 1967. An action for specific performance was also filed and was pending at the time of trial of the present suit.

Upon the trial, the cause was submitted on plaintiff's verdict-directing instruction as follows:

### "INSTRUCTION NO. 3

"Your verdict must be for plaintiff if you believe:

"First, that plaintiff was a licensed real estate broker during the years of 1966 and 1967, and

"Second, defendants listed the farms described in evidence with plaintiff, and defendants agreed to pay plaintiff a commission equal to five per cent of the sale price if plaintiff produced a buyer for said farms on terms and for a price acceptable to the defendants, and

"Third, plaintiff did produce a buyer, who executed a contract for the purchase of said farms."

The court also gave Instruction No. 6 for plaintiff:

## "INSTRUCTION NO. 6

"You are informed that in order for the plaintiff to recover in this case, it is only necessary that his efforts were the efficient and procuring cause for producing a buyer who executed a contract for the purchase of the farms, and this is true even though the sale of the farms to the purchaser procured by plaintiff was not perfected."

Defendants' tendered Instruction A, which was refused, read:

## "INSTRUCTION NO. A

"Your verdict must be for the Defendants if you do not believe:

"First: That Defendants listed their farm for sale with Plaintiff, and

"Second: That the amount of the selling price, the commission and the terms and conditions of said listing were agreed upon between the Plaintiff and Defendants, and

"Third: That the Plaintiff procured a purchaser who was ready, willing and able to purchase said farm at the agreed price and on the agreed terms and conditions, and

"Fourth: That Defendants thereafter refused to make such sale."

The jury returned a verdict for plaintiff for $22,931.25. After their motion for new trial was overruled, defendants appealed.

On this appeal, the first point urged is error in giving Instruction No. 3 because it failed to hypothesize that plaintiff produced a purchaser who was ready, able and willing to purchase the real estate involved.

In support of this contention, appellants point to MAI No. 29.01. MAI No. 29.01 had not been adopted at the time this case was tried. Appellants contend, however, that any submission of a case for a real estate broker's fee when the sale is not consummated must follow MAI No. 29.01 insofar as it requires a finding that the broker produced "a purchaser who was ready, willing, and able to purchase."

This contention is readily answered by numerous cases in which the purchaser did enter into a contract with the seller. In the case of Knisely v. Leathe, 256 Mo. 341, 166 S.W. 257, this Court recognized that in the event the seller accepts the purchaser and contracts with him as such, the issue of the purchaser's being ready, willing and able to perform is eliminated from the broker's claim for his commission. In that case, the Court said (166 S.W. 266):

" * * * The doctrine bears the impress of reason. The agent brings to the seller a purchaser. The seller does not have to accept any kind of a purchaser, but he may do so. The seller can size up the purchaser and either accept or reject him. If he accepts him, he at once becomes liable to the real estate agent who produced the customer, although the purchaser may not afterwards meet the expectations of the seller. The fact, if it be a fact, as alleged in the petition, that Leathe accepted Wolcott as a purchaser by entering into a contract of sale with him, if he did enter into such contract, would render Leathe liable to Knisely for the agreed commission, unless there was some express agreement to the contrary. As said, the rule is based upon the idea that the seller does not have to accept an unworthy or unreliable purchaser, but that he may accept him if he choose so to do, and, if he does accept the purchaser, the deal between him and his

real estate agent becomes a sealed lock. The commission has been earned, and must be paid."

The rule has been followed in a number of subsequent cases. See Isaac T. Cook Co. v. Craddock-Terry Co., Mo.App., 109 S.W.2d 731, 733 [1-3] and cases there cited; Brummet v. Livingston, Mo.App., 384 S.W.2d 101, 104 [4, 5].

■ Under these cases, Kelly was entitled to proceed on the theory embodied in his Instruction No. 3. The trial court did not err in failing to require a ready, willing and able proposition.

The objection to Instruction No. 6 rests, in part, on the same basis and insofar as it does, that objection is without merit. Appellants further object that Instruction No. 6, along with Instruction No. 3, amounted to permitting plaintiff two verdict-directing instructions which were contrary to and in conflict with each other and gave the jury a roving commission.

The respondent relies upon the approval by the Kansas City Court of Appeals in Wright v. Jaegeris, 427 S.W.2d 276, 280 [3], of a similar instruction.

■ Instruction No. 6 was a cautionary instruction, not a verdict-director. Plaintiff's verdict-director. quoted above, and defendants' converse of the issues submitted by plaintiff's principal instruction clearly delineated the issues for the jury's resolution. In the presentation of his case, plaintiff carefully refrained from going into events which occurred after the contract had been signed. These matters were opened up by defendants over plaintiff's objection. In view of plaintiff's theory that the signing of the contract was the event which gave rise to his right to a commission, plaintiff was entitled to let the jury know that actual consummation of the transaction was not essential for his recovery. There is little doubt that the caution could have been better worded. However, viewing the instruction as a whole, we conclude that Instruction No. 6 could

not have misled the jury along the lines suggested by defendants.

■ Appellants' next contention is that the trial court erred in refusing to give their offered Instruction A. This instruction would have submitted the converse of the "ready, willing and able" purchaser theory which appellants contend was the only theory upon which plaintiff could properly have recovered. This latter proposition has already been answered. Therefore, no error lay in refusing to submit the converse of a theory which plaintiff did not and was not required to submit.

■ Appellants' final point is that the evidence failed to establish an agreement between plaintiff and defendants according to which plaintiff would be entitled to a commission, and further that the evidence failed to show that plaintiff had completed the acts necessary to entitle him to such commission.

Plaintiff testified in his direct examination in chief that when Mr. Craigmiles listed the farm, plaintiff told him that his commission was 5% if plaintiff produced a buyer and that Mr. Craigmiles "agreed to this very definitely." This testimony was not destroyed by plaintiff's answers to questions on cross-examination, going to the meaning of the provision of the May 6th document that 5% commission was to be paid plaintiff "as per agreement." This testimony at the most showed that plaintiff was to pay the amount owed in reasonable amounts at reasonable times.

Appellants argue that plaintiff in his testimony contradicted himself about the commission when he stated: "It doesn't say —we had no agreement. He wasn't paying me 5%, if that's what you mean." There is ambiguity in this response. However, plaintiff's testimony was otherwise consistent with his claim, reinforced by the writing, that he was to receive a 5% commission. The isolated statement relied upon does not destroy the probative worth of plaintiff's otherwise consistent testi-

mony. Murray v. St. Louis Public Service Co., Mo.App., 201 S.W.2d 775, 779 [2, 3].

The contention that there was no evidence that plaintiff did what he was required to do, under his agreement with defendants, in order to obtain a commission, is without merit. Plaintiff testified definitely that he was to receive a commission if he produced a buyer. Of course, that buyer had to purchase on the terms specified by the defendants. However, defendants were the ones who fixed the terms and likewise were the ones who could change them. Although defendants first insisted that they wanted 25% down, the fact that they agreed to a purchaser who offered different terms does not mean that plaintiff had not performed so as to be entitled to the commission. Bowman v. Rahmoeller, 331 Mo. 868, 55 S.W.2d 453, 458 [6, 7].

We reject appellants' contention that only the testimony of defendants showed what plaintiff was required to do in order to earn his commission. Plaintiff's evidence showed his agreement with defendants. In determining whether or not defendants' motion for directed verdict should have been sustained, we consider only plaintiff's evidence and any part of defendants' evidence favorable to plaintiff. Defendants' evidence that plaintiff failed to do what defendants considered plaintiff was required to do is of no import in determining the submissibility of plaintiff's cause of action.

Judgment affirmed.

HOUSER, C., concurs.

HIGGINS, C., not sitting.

PER CURIAM.

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.