**CENTRAL BANK OF LAKE OF THE OZARKS, Plaintiff/Appellant,**

v.

**James E. SHACKLEFORD, Defendant/Respondent,**

and

**Marcia A. Shackleford, Defendant.**

No. 19356.

Missouri Court of Appeals,
Southern District,
Division Two.

March 16, 1995.

Motion for Rehearing or Transfer to Supreme Court Denied April 7, 1995.

Application to Transfer Denied
May 30, 1995.

Dale C. Doerhoff, Thomas A. Vetter, Cook, Vetter, Doerhoff & Landwehr, Jefferson City, for plaintiff/appellant.

James J. Sauter, Mary Elizabeth Dorsey, Deeba Sauter Herd, St. Louis, for defendant/respondent.

CROW, Judge.

Plaintiff, Central Bank of Lake of the Ozarks ("Bank"), sued Defendants, James E. Shackleford and Marcia A. Shackleford, for principal and interest due on two promissory notes. Defendant James E. Shackleford ("Shackleford")[1] filed a counterclaim against

---

**1.** None of the issues in this appeal involve Defendant Marcia A. Shackleford. Consequently, for convenience we refer to Defendant James E. Shackleford by his surname. Where necessary to refer to him and Marcia A. Shackleford together, we use "Defendants."

Bank for "tortious interference with a business expectancy."

The trial court granted a motion by Bank for summary judgment on its claims against Defendants, and entered judgment for Bank against both Defendants for the principal and interest due on each note. Defendants do not appeal that adjudication.

Shackleford's counterclaim was tried to a jury, which returned a verdict for him against Bank for $84,500. The trial court entered judgment on the counterclaim per the verdict. Bank appeals that adjudication.

Bank's brief presents four assignments of error. However, inasmuch as point II is meritorious and requires reversal, we need not consider any point except it.

■ Point II maintains the trial court erred in denying Bank's motion for judgment notwithstanding the verdict on Shackleford's counterclaim in that the evidence failed to make a submissible case against Bank. In addressing that issue, we consider the evidence and reasonable inferences therefrom in the light most favorable to the verdict. *Bayne v. Jenkins,* 593 S.W.2d 519, 521[1, 2] (Mo. banc 1980); *Sooter v. Magic Lantern, Inc.,* 771 S.W.2d 359, 362[6] (Mo.App.S.D. 1989).

On March 22, 1985, The Cape Condominium Development Corp. ("TCCDC") borrowed $662,000 from Bank, evidenced by a promissory note signed on behalf of TCCDC by its president, Lorenzo D. Cascarini ("Cascarini"), and its secretary, Clayton Jay Allen ("Allen"). To secure the note, TCCDC gave Bank a first deed of trust on Lots 74, 75 and 76 of Horseshoe Bend No. 7, a subdivision in Camden County. As additional security, a "Guaranty" was appended to the note. There were five guarantors: (1) Cascarini, individually; (2) Allen, individually; (3) Jo Ann Cascarini, individually; (4) Elena Napoli Allen, individually; (5) "Ozark II, a limited partnership, By Alcas Development Corporation, General Partner." Two officers of Alcas Development Corporation ("Alcas") signed on its behalf: Cascarini, shown as president, and Allen, shown as secretary.

The TCCDC note was also secured by a deed of trust on Lots 72 and 73 of Horseshoe Bend No. 7, given by Ozark II, the record owner. That deed of trust was executed on behalf of Ozark II by general partner Alcas, acting through president Cascarini and secretary Allen.

The purpose of the loan is revealed in a "Construction Loan Agreement," also dated March 22, 1985. The funds were to be used to construct a "condominium project" including residential units, a clubhouse, paved roads and other items. The project was denominated "The Cape" and encompassed the five lots covered by the deeds of trust.

On June 29, 1985, TCCDC borrowed $227,781.83 more from Bank, again secured by (1) a deed of trust on Lots 74, 75 and 76, and (2) a deed of trust given by Ozark II on Lots 72 and 73. The purpose of that loan was the same as the $662,000 loan.

By November 12, 1985, the entire proceeds of both loans had been disbursed. However, the roads for the project had not been paved, no swimming pool had been built, and construction had not commenced on a sewage system or well. As a result, no condominium units had been sold.

On March 11, 1986, TCCDC borrowed $65,000 more from Bank, secured as before by a deed of trust on Lots 74, 75 and 76, and a deed of trust on Lots 72 and 73.

On April 1, 1986, the $662,000 note became due. None of the principal was paid, and interest was delinquent.

Shackleford, a licensed real estate broker, was doing business as Big Bear Realty at Lake Ozark during the time these events were unfolding. At trial, he identified Exhibit E as a listing agreement he wrote with "Cape Condominium, Incorporated."

Among other things, Exhibit E: (1) bears a date of April 8, 1986, (2) designates Big Bear Realty as exclusive agent to find a cash buyer for property described as "The Cape Condominium Inc.," (3) names the listing parties as "Jay Allen—Don Cascarini," and (4) has an expiration date of October 8, 1986. At the foot of Exhibit E, the name of the "Owner" appears in handwriting. While the writing is difficult to decipher, it appears to be: "L D Cascarini (Pres) Cape Condo Inc."

Shackleford testified he listed the property for $1,300,000; however, Exhibit E shows a handwritten price of $1,350,000, and the property appeared in "multi list" at the latter price.

At the time of the listing, Shackleford knew "they [were] having problems with the property."

On May 29, 1986, Bank's lawyer sent a "demand letter" to Cascarini and his wife, Allen and his wife, Ozark II (c/o Cascarini), Alcas (c/o Cascarini), and "The Cape Condominium Project" (c/o Cascarini and Allen). Cascarini's address was in La Habra Heights, California; Allen's address was in Signal Hill, California.

The letter stated that as of May 22, 1986, interest totalling $48,082.70 was due on the $662,000 loan. The principal, which had come due April 1, 1986, remained unpaid. Interest was accruing at the rate of $199.51 per day.

The letter further stated that the principal amount of the $227,781.83 loan would be due June 30, 1986. As of May 22, 1986, interest due on that loan totaled $7,878.76. Interest was accruing at the rate of $68.65 per day.

Additionally, the letter stated that the principal amount of the $65,000 loan would be due June 11, 1986. As of May 22, 1986, interest due on that loan totaled $1,410.41. Interest was accruing at the rate of $19.59 per day.

The letter warned that unless there was "some resolution of this problem" within ten days, Bank would commence foreclosure proceedings.

On a date unrevealed by the record, but inferably in late June, 1986, Russell Homuth, a realtor, saw a "flyer that [Shackleford] sent out" regarding The Cape. Homuth phoned William E. Burgess in Corpus Christi, Texas, because Homuth "had heard he was interested in buying a ... distressed condominium project."

Burgess informed Homuth that he (Burgess) would be in the Lake of the Ozarks area "around July 4th."

On July 3, 1986, Homuth showed Burgess The Cape. Burgess testified, "I was out there probably an hour with him."

The next day, Homuth and Burgess returned to The Cape. This time, they were accompanied by Richard Villers and Eldon Plaster. Burgess avowed that after this inspection, he, Villers and Plaster were "interested" in The Cape.

At trial, Homuth identified Exhibit D as "the contract that I wrote up." Exhibit D is captioned "Contract for the Sale of Real Estate." It is dated July 4, 1986, names the "Seller" as "Al—Cas Development Corporation—Limited Partnership Ozark 11," and names the "Buyer" as "TBR Company William E Burgess President." The real estate is described as: "Property known as the Cape Condominiums: Legal description to govern." The price is shown as: "One Million Two Hundred Thousand Dollars." One of the conditions is: "Buyer's ability to obtain a ... loan ... in the amount of One Million One Hundred Thousand Dollars." There is a handwritten notation: "This Contract Subject To Approval of Bank of Lake Ozark." The closing date is fixed at "on or before" October 1, 1986.

Exhibit D shows the "Buyer" signed it on "7/4/86." Asked at trial why the "Buyer" was shown as TBR Company, Burgess explained, "That was basically the only one I had money in at that time." According to Burgess, this was alright with Villers and Plaster. Burgess gave Homuth a $10,000 check drawn on the account of TBR Company as "earnest money."

Homuth took Exhibit D to Shackleford's office where, according to Homuth, "[T]here was some discussions by telephone with the sellers and the buyers." Homuth continued, "[T]he contract was changed and initialed from the original contract." Homuth pointed out that the original price ($1,200,000) was "scratched out" and replaced by $1,300,000. Exhibit D also shows that the amount of the loan upon which the transaction was contingent was increased from $1,100,000 to $1,500,000.

After the changes, Exhibit D was given to Shackleford. He flew to Los Angeles to get

it signed. Exhibit D shows it was signed on "7–6–86" by "Alcas Development Corp. L. D. Cascarini (Pres)."

Shackleford returned to Missouri and "immediately" presented Exhibit D to Bank. James Mead, an officer of Bank who was "responsible" for the TCCDC loans, conceded he became "aware" of Exhibit D "about July 6th [1986]."

At trial, Mead identified a memorandum prepared by him regarding a phone call he received from Cascarini about 5:00 p.m., July 8, 1986. According to the memorandum, Mead and Cascarini discussed the "pending sales contract" with TBR Company. Because the closing date was not until October 1, 1986, and there was a loan contingency of $1,500,000 for a $1,300,000 purchase, Mead advised Cascarini that Bank had no choice but to begin publication for foreclosure on July 10, 1986, unless Cascarini could arrange to bring the interest current and pay certain insurance that Bank was obligated to pay July 21, 1986. Cascarini stated he doubted he could raise the necessary money (approximately $83,000) and asked whether, if Bank proceeded with foreclosure and The Cape was not "taken to chapter 11," Bank would agree to waive the personal guaranty on the TCCDC debt by him and Allen. Mead advised Cascarini that he (Mead) had no authority to make such a commitment but he would recommend it to Bank's board.

On July 10, 1986, Bank's lawyer sent six notices of trustees' sales to a publisher, asking that publication begin July 14, 1986. As we comprehend the evidence, there was a notice for each of the six deeds of trust mentioned earlier in this opinion.

Shackleford testified he attended a meeting at Bank on July 16, 1986. Others present, according to Shackleford, were: Homuth, Burgess, Plaster, Villers, Mead, Frank Christensen,[2] James Franklin, Sr. (Bank's president and board chairman), and John Curran (Bank's lawyer). Burgess recalled that Richard King, characterized by Burgess as Villers' lawyer, also attended.

Burgess testified the meeting was arranged "to try to obtain the financing to buy [The Cape]." His testimony continued:

"Q What did . . . the officers of the bank, say about financing?

A I think they basically had informed us they had turned it down as far as I know, that was my impression.

Q What did they say about foreclosure?

A Well, it was in the process of foreclosure; they were going to go ahead with it.

Q Did . . . Mr. Mead or Mr. Franklin [say anything] about the owners in Chapter 11?

A I brought up the question myself, personally: What happens if they go into Chapter 11? And I was assured that they had worked out an arrangement that they had agreed to that wouldn't go in Chapter 11.

Q Which would allow the foreclosure?

A Yes. And John Curran made the statement that he personally knew they wouldn't . . . go into Chapter 11."

Shackleford's account of the meeting included this: "Mr. Franklin says, 'Boys, we can't carry the $1,000,000. We're going to have to foreclose.' So at that time Mr. Villers spoke up and he said, 'Well, you go ahead and foreclose then we'll buy it from the bank and save money.'"

On July 18, 1986, Villers sent Mead a six-page letter outlining a "proposal" for The Cape. It addressed various subjects including completion of unfinished items (road, parking area, well, swimming pool, tennis court), marketing strategy, the sequence in which buildings would be sold, financing, cash flow and debt reduction. The letter concluded:

"We appreciate the time and the opportunity to have met with someone that has both a knowledge of the Lake of the Ozarks and a background in development. We know that a project of this complexity will take some time to package and there will be many questions. With the back-

---

**2.** Christensen was a real estate broker by whom Homuth was employed.

ground of the group involved, we are dedicated to seeing this project thru to a profitable conclusion for all."

Bank's foreclosure on The Cape took place as scheduled. According to the trustee's deeds,[3] the sale was conducted August 5, 1986. Bank was the only bidder. The successful bids, as shown in the trustee's deeds, totaled $68,540.

After foreclosure, Bank did not advertise The Cape for sale or list it with a realtor. Burgess continued negotiating with Bank to buy The Cape. In answer to an interrogatory, Bank stated it reached an agreement on or about September 2, 1986, to sell The Cape to Timberlake Investments, Inc.

On October 3, 1986, a certificate of incorporation was issued to Timberlake Investments, Inc. ("Timberlake"), a Missouri corporation. Burgess was designated its registered agent.

By letter dated October 24, 1986, Bank committed itself to loan Timberlake $1,000,-000 to enable Timberlake to buy The Cape from Bank. The commitment was contingent on various requirements including a first deed of trust on The Cape and a personal guaranty by Burgess and his wife, Villers and his wife, and Plaster and his wife. Timberlake and the six individual guarantors agreed to the conditions.

By another letter bearing the same date, Bank committed itself to loan Timberlake an additional $200,000 to complete unfinished amenities at The Cape. Security for this loan, like the $1,000,000 loan, was to include a personal guaranty by the six individuals identified in the preceding paragraph. Timberlake and the six individual guarantors agreed to the conditions.

In a contract dated November 3, 1986, Timberlake agreed to buy The Cape from Bank for $1,200,000. The contract provided for a $10,000 payment upon signing, with the remaining $1,190,000 to be paid at closing.

The transaction was closed December 31, 1986. Asked at trial whether Bank made a "100 percent loan," Mead answered: "We made about a 90 percent loan. Approximately $145,000 in cash was paid on closing."

Shackleford's brief states Bank loaned Timberlake $1,045,000 to finance the purchase. That is confirmed by the closing statement, which shows the $1,200,000 purchase price was paid by (1) the proceeds of a $1,045,000 loan, (2) the $10,000 deposit, and (3) cash at closing. Shackleford maintains that $100,000 of the cash paid at closing came from a loan by Bank to Burgess, hence Timberlake and the trio of Burgess, Plaster and Villers put only $45,000 of "their own money" into The Cape. In support of this contention, Shackleford cites testimony by Franklin. While Franklin's testimony on the matter is vague, we view it favorably to Shackleford and, so viewed, it arguably supports his contention.

Shackleford's amended counterclaim, on which the case was tried, pled: (a) Bank had knowledge of the listing agreement between Shackleford and "The Cape Condominium Inc.," whereby Shackleford was to receive a commission for procuring a buyer ready, willing and able to purchase The Cape; (b) Bank was aware of the contract wherein TBR Company agreed to buy The Cape for $1,300,000; (c) Bank intentionally interfered in Shackleford's relationship with the seller and buyer by foreclosing on The Cape and thereafter selling it to Timberlake, a "company formed for the purchase by the principals of TBR"; (d) the contract between Bank and Timberlake was made for the purpose of avoiding payment of a commission on the sale.

At trial, Shackleford explained that the contract wherein TBR Company agreed to buy The Cape for $1,300,000 contained a provision for an eight percent realtor's commission, which would have been $104,000. Shackleford added, "I had a deal with ... Christensen[4] ... that we would do a 50/50

---

**3.** The March 11, 1986, deed of trust on Lots 72 and 73 was foreclosed, as was the March 11, 1986, deed of trust on Lots 74, 75 and 76. Bank received two trustee's deeds, one for each deed of trust.

**4.** Footnote 2, *supra.*

split on the commissions." Consequently, Shackleford insisted Bank owed him $52,000 plus nine percent interest since December 31, 1986. The jury's award was consistent with that arithmetic.

Determining whether the evidence made a submissible case of tortious interference with a business expectancy against Bank begins by identifying the applicable law. In *Downey v. United Weatherproofing, Inc.*, 363 Mo. 852, 253 S.W.2d 976, 980 (1953), we learn:

"[O]ne who maliciously or without justifiable cause induces a person to breach his contract with another may be held responsible to the latter for the damages resulting from such breach. The term 'maliciously' in this connection alludes to malice in its technical legal sense, that is, the intentional doing of a harmful act without justification or excuse, and does not necessarily include actual malice, that is, malice in the sense of spite or ill will.

The right to perform a contract and to reap the profits therefrom, and the right to performance by the other party, are property rights entitling each party to the fulfillment of the contract by performance. And the intentional interference with the contractual relation without just cause so as to effect a breach of the contract is a wrong for which the wrongdoer may be held accountable in damages. The right of recovery for inducing a breach of a contract is but one instance of the protection which the law affords against unjustified interference in business relations."

The elements of a cause of action for tortious interference with business relations are set forth in *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.,* 586 S.W.2d 310, 315 (Mo. banc 1979):

"(1) A contract or a valid business relationship or expectancy (not necessarily a contract);

(2) Defendant's knowledge of the contract or relationship;

(3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;

(4) The absence of justification; and,

(5) Damages resulting from defendant's conduct."

The verdict-directing instruction tendered by Shackleford and given by the trial court purported to be a modified version of MAI 23.11 [1981 Revision]; it read:

"Your verdict must be for [Shackleford] if you believe:

First, [Shackleford] produced ready, willing and able buyers for the property in question with a business expectancy to receive a commission, and

Second, [Bank] knew of the business expectancy, and

Third, that, except for the conduct of [Bank], [Shackleford] would have realized this business expectancy, and

Fourth, [Bank's] conduct was intentional and without justification or excuse, and

Fifth, [Shackleford] was thereby damaged."

Bank emphasizes that the above instruction fails to identify the conduct by Bank which allegedly prevented Shackleford from realizing his business expectancy. The instruction hypothesizes only that except for the conduct of Bank, Shackleford would have realized the expectancy. The instruction yields no clue as to what the conduct was.

Shackleford's brief identifies Bank's allegedly tortious conduct thus:

"Bank ... intentionally interfered with Shackleford's business expectancy and business relationship by immediately interfering with and neutralizing the Sellers, Don Cascarini and Jay Allen, by making a deal with the Sellers to preclude a Chapter 11 Bankruptcy proceeding so the Bank could foreclose. A Chapter 11 action would have severely hampered the Bank in its attempt to foreclose. Then, without owning the property, the Bank placed itself in the shoes of the owners and interfered with Shackleford's Buyers, securing Shackleford's Buyers' commitment to buy the property from the Bank once the foreclosure had been completed.

Certainly the facts ... show an absence of justification for the actions of the Bank. This case is not about whether or not the

Bank had a right to foreclose. This ... was admitted by Shackleford in closing argument. The Bank lacked justification when the Bank tampered with Shackleford's Sellers. The Sellers would have put the project in Chapter 11 and the Bank would not have been able to foreclose when it did. The Bank lacked justification when the Bank tampered with Shackleford's Buyers in negotiating with the Buyers before the Bank owned the property. The Bank's motive is easy to understand— make a quick one hundred fifty thousand dollars ... gain and avoid paying an honest and just commission. The foreclosure cannot be used as diversion, to avoid the Bank's culpability for its conduct."

Shackleford's reference to a $150,000 gain is based on testimony by Mead (at deposition and trial) that Bank realized a "deferred" gain of $150,000 by foreclosing on The Cape and selling it to Timberlake.

An attentive reader will have recognized there are issues regarding identity of the parties to (a) the listing agreement and (b) the contract dated July 4, 1986, naming TBR Company as buyer ("the TBR contract").

As to the listing agreement, the parties listing the property are shown as Cascarini and Allen; the signature at the foot is by Cascarini in his capacity as president of "Cape Condo Inc." Cascarini and Allen, individually, did not own any of the five lots comprising The Cape. Three of the lots were owned by TCCDC and two were owned by Ozark II, a limited partnership. Neither TCCDC nor Ozark II is named a party to the listing agreement. It is thus arguable that the listing agreement was not made by an owner of any of the real estate constituting The Cape.

The TBR contract names the seller as "Al—Cas Development Corporation—Limited Partnership Ozark 11." The signature at the foot is "Alcas Development Corp. L.D. Cascarini (Pres.)." Alcas was evidently a general partner in Ozark II, a limited partnership. Thus, it is at least arguable that

Ozark II was bound by the TBR contract. However, no one purported to sign the TBR contract on behalf of TCCDC, the owner of three of the five lots constituting The Cape. Consequently, it is arguable that at best, the TBR contract covered only part of The Cape.

However, as shall become apparent *infra*, it is unnecessary to figure out the legal effect of the circumstances set forth in the two preceding paragraphs.

Assuming, arguendo, that the listing agreement and the TBR contract were binding on the owners of The Cape (TCCDC and Ozark II), we must see whether the evidence demonstrated Bank interfered with Shackleford earning a commission.

■ The listing agreement required Shackleford to find a buyer for The Cape for a cash price of $1,350,000. There is no evidence he found one, and no evidence Bank did anything to prevent his finding one.

The purchase price in the TBR contract was $1,300,000; however, the duty to buy was contingent on the buyer obtaining a loan of $1,500,000. The buyer never obtained one [5] (nor did the eventual purchaser). Viewing the evidence favorably to Shackleford, Bank loaned only $1,345,000 in the Timberlake–Burgess–Villers–Plaster transaction.

Nothing in the TBR contract prevented the buyer from obtaining a $1,500,000 loan from a lender other than Bank. The record is bare of any evidence that TBR Company (or Burgess, Villers or Plaster) attempted to do so.

Had Shackleford found a cash buyer for The Cape at a price agreeable to TCCDC and Ozark II, the duty to pay the commission would have been on those two entities (assuming they were bound by the listing agreement), not on anyone else. The TBR contract provided: "Seller agrees to pay the agent the commission agreed upon between them. 8%." There is no evidence that TBR Company, Burgess, Villers, Plaster, Timberlake or Bank had any contract with Shackle-

---

5. Had The Cape been sold per the TBR contract, Shackleford would have been entitled to a commission from the owners of The Cape (assuming they were bound by the listing agreement) even though the terms of the sale differed from the listing agreement. *Kelly v. Craigmiles,* 460 S.W.2d 577, 583 (Mo.1970).

ford. A contract of employment is the essential element for recovery of a commission on a real estate transaction. *Ham v. Morris,* 711 S.W.2d 187, 190 (Mo. banc 1986).

From the date of the listing agreement until the date TCCDC and Ozark II lost The Cape at foreclosure, Shackleford never produced a buyer for a cash price of $1,350,000, and the buyer in the TBR contract never had a duty to consummate the sale because the $1,500,000 loan contingency was unmet. Accordingly, there was never a contractual obligation on anyone to pay Shackleford a commission.

■ Shackleford's theory as to what constituted tortious conduct by Bank is quoted earlier in this opinion. As we understand Shackleford, he does not assert Bank tortiously interfered with his expectancy of a commission by refusing to loan $1,500,000 so the TBR contract could be consummated. Refusing to loan a prospective buyer money so a seller can escape foreclosure has been held not to constitute tortious interference with a business expectancy where the lender was under no obligation to make the loan. *Vermont National Bank v. Dowrick,* 144 Vt. 504, 481 A.2d 396 (1984). The Supreme Court of Vermont noted: "The rationale for this rule rests upon fundamental assumptions in free business enterprise. Each business enterprise must be free to select its business relations in its own interest." 481 A.2d at 400–01.

The same rationale appears in *Quintana v. First Interstate Bank of Albuquerque,* 105 N.M. 784, 737 P.2d 896 (App.1987), where a bank refused to accept new mortgagors on terms unacceptable to it. The Court of Appeals of New Mexico said: "The mere refusal to deal with a party cannot support a claim for tortious interference with contractual relations." 105 N.M. at 786, 737 P.2d at 898[4]. Consequently, Bank's refusal to loan $1,500,-000 (on which the TBR contract hinged) did not constitute tortious interference with Shackleford's expectancy of a commission.

■ In oral argument before us, Shackleford announced his theory was that Bank tortiously interfered with his business expectancy by agreeing with the owners of The Cape that Bank would waive its claim against the individual guarantors of the TCCDC debt in return for the owners keeping The Cape out of bankruptcy, thereby enabling Bank to foreclose on The Cape and sell it to the Timberlake–Burgess–Villers–Plaster group at a $150,000 profit.

■ As we have seen, one element of a cause of action for tortious interference with a business expectancy is absence of justification for the alleged interference. *Fischer,* 586 S.W.2d at 315. The burden of presenting substantial evidence to establish absence of justification was on Shackleford. *Community Title Co. v. Roosevelt Federal Savings and Loan Association,* 796 S.W.2d 369, 372[5] (Mo. banc 1990).

■ One who has an existing economic interest in another's business affairs is privileged to interfere with a business expectancy to protect his own economic interest and is not liable for such interference if his action was one which he had a definite legal right to take without any qualification. *Community Title,* 796 S.W.2d at 372[8, 9]; *Wigley v. Capital Bank of Southwest Missouri,* 887 S.W.2d 715, 720 (Mo.App.S.D.1994). That is, protecting one's economic interest constitutes justification for interference with a business expectancy unless one employs improper means to protect that interest. *Beelman River Terminals, Inc. v. Mercantile Bank, N.A.,* 880 S.W.2d 903, 908 (Mo. App.E.D.1994). Improper means are those which are independently wrongful notwithstanding injury caused by the interference. *Id.*

Here, the entire principal of all three TCCDC notes was due and unpaid, and interest on all three was delinquent, when Mead promised Cascarini on July 8, 1986, to recommend to Bank's board that Bank not pursue the individual guarantors of the TCCDC debt if the owners of The Cape agreed not to put The Cape in bankruptcy, thereby enabling Bank to proceed with foreclosure.

It was obviously in Bank's economic interest to obtain control of The Cape as soon as possible. Mead testified he knew of no sales activity at The Cape in the spring and summer of 1986. Franklin testified that in July,

1986, Cascarini and Allen had "left and went back to California ... nobody was in charge down at the project." Additionally, some appliances were removed and Bank was "afraid they'd strip the whole project." Franklin's testimony continued:

"Q  Was that a consideration then in proceeding with foreclosure?

A  To get possession so we could protect our collateral."

Although the jury was not obliged to believe Mead and Franklin, it is inferable that Bank's security interest in The Cape would have been adversely affected had the owners put The Cape in bankruptcy, thereby delaying foreclosure and exposing the improvements to risk and deterioration.

As we have seen, Bank had the right to refuse to loan TBR Company (and the Burgess–Villers–Plaster trio) the $1,500,000 on which the TBR contract hinged. Bank also had the right to foreclose on The Cape. Bank also had the right to waive its claim against the individual guarantors of the TCCDC debt in return for the owners of The Cape forgoing bankruptcy. That was a business judgment Bank was entitled to make in protecting its interest. *Wigley*, 887 S.W.2d at 720. Finally, Bank had the right to sell The Cape to the Timberlake–Burgess–Villers–Plaster group (or anyone else) at the best price, and on the best terms, that Bank could negotiate.

It is arguable that none of the acts in the preceding paragraph prevented Shackleford from earning a commission. He could have continued seeking a buyer who met the requirements of the listing agreement until August 5, 1986, when the owners of The Cape lost it at foreclosure.

However, even if Bank's acts did erase the possibility of Shackleford earning a commission, Bank was justified in doing what it did; therefore, the evidence did not establish the fourth element (absence of justification) of a cause of action for tortious interference with a business expectancy.

It was Shackleford's burden to present substantial evidence supporting each element of his cause of action. *Francisco v. The Kansas City Star Co.*, 629 S.W.2d 524, 529[4] (Mo.App.W.D.1981). Because the evidence failed to establish the fourth element, there was no submissible case against Bank, hence the trial court erred in denying Bank's motion for judgment notwithstanding the verdict on Shackleford's counterclaim. The portion of the judgment regarding the counterclaim must be reversed.

■ Where a party asserting a claim prevails in the trial court and an appellate court reverses because of insufficient evidence, the preference is for remand for a new trial. *Moss v. National Super Markets, Inc.*, 781 S.W.2d 784, 786[3] (Mo. banc 1989). Reversal without remand is appropriate only if the appellate court is persuaded the claimant cannot make a submissible case on retrial. *Id.* Addressing that issue, we conclude from the record that Shackleford has presented all available evidence in support of his counterclaim and cannot muster additional evidence sufficient to make a submissible case of tortious interference with a business expectancy. Therefore, remand for a new trial is unwarranted. *Lance v. Van Winkle*, 358 Mo. 143, 213 S.W.2d 401, 404–05[11] (1948).

The portion of the judgment adjudicating Bank's petition against Defendants is affirmed. The portion of the judgment adjudicating Shackleford's counterclaim against Bank is reversed.

GARRISON, P.J., and PREWITT, J., concur.