Kevin L. **COLE**, Respondent/
Cross–Appellant,

v.

**THE GOODYEAR TIRE & RUBBER
COMPANY**, Appellant/Cross–
Respondent.

No. 72045.

Missouri Court of Appeals,
Eastern District,
Division One.

March 10, 1998.

Application for Transfer Denied
June 16, 1998.

Thomas C. Walsh, Elizabeth C. Carver, Bryan Cave, L.L.P., St. Louis, for appellant.

Paul E. Kovacs, Armstrong, Teasdale, Schlafly, Davis & Dicus, St. Louis, for respondent.

GARY M. GAERTNER, Judge.

Appellant/Cross-Respondent, the Goodyear Tire & Rubber Company ("Goodyear"), appeals the judgment entered by the Circuit Court of the City of St. Louis, after a jury found for Respondent/Cross-Appellant, Kevin L. Cole ("plaintiff"), on his personal injury-negligence action against Goodyear and awarded plaintiff $7,800,000 in compensatory damages and $18,400,000 in punitive damages. The compensatory damages award was reduced, first by 25% by reason of the finding plaintiff was 25% contributorily at fault, and then to reflect plaintiff's settlement made with another defendant.[1] Plaintiff cross-appeals challenging the method by which the compensatory damages award was calculated. We affirm in part and reverse and remand in part.

On February 12, 1990, plaintiff was mounting a 16.5" Goodyear 10-ply tubeless truck tire on a 16.5" wheel rim.[2] As plaintiff was putting air into the tire, the tire came off the wheel rim with tremendous force, striking plaintiff in the head, and causing him serious and permanent head and facial injuries.

Plaintiff brought a personal injury-negligence action sounding in strict liability-failure to warn, against Goodyear, the manufacturer of the tire, and Tire Mart, the company that sold the tire. Plaintiff alleged the tire was defectively designed because it contained a multi-strand bead vulnerable to failure when the tire was being mounted, and a bead did in fact break when plaintiff was inflating the tire, causing the tire to come off the wheel rim.[3] Plaintiff further alleged the tire had a manufacturing defect. Plaintiff claimed Goodyear knew of the above problems yet failed to warn of the possibility the bead could break when the tire was being inflated, causing the tire to come off the wheel rim and become airborne. Plaintiff alleged Tire Mart misrepresented the tire was free from defects and had not properly inspected the tire before selling it to plaintiff.

## I. PLAINTIFF'S EVIDENCE

### A. *The Accident*

Plaintiff testified he was injured mounting a Goodyear tire he purchased from Tire Mart in 1988. The tire was a "take-off" tire, which is a tire that comes with a new truck but is taken off and exchanged for a different tire when the truck is sold. Plaintiff testified,

---

1. Tire Mart was named as a defendant in this action, but settled with plaintiff during trial.

2. Goodyear claimed the tire was manufactured in 1967. Plaintiff claimed the tire was manufactured after that date, possibly as late as the mid-1970's.

3. All tires for use on passenger cars and trucks have two beads, one on each side. Beads are composed of steel wire. Single-strand or multiple-strand steel wire can be used. The wire is wound around itself to form a hoop that contains several thicknesses of wire. The beads on the Goodyear tire in this case were made of multiple-strand wire .037 inches in diameter. Goodyear now uses wire .050 inches in diameter. When the tire is on the wheel rim, the beads push up against the wheel rim flange and create a bond that holds the tire on the wheel rim and allows it to retain air.

When a tire is properly mounted on a wheel rim, the wires in the beads are intended to remain parallel to each other. A deviation called "chording" occurs when a flat spot forms in the bead and the wires lose their parallel alignment. If chording occurs, all of the stress on the bead falls upon a single strand. One by one, the strands break causing the bead to fail.

before he purchased the tire, he checked the beads and they looked okay. Plaintiff had mounted hundreds of tires and was aware of the dangers of overinflation. He testified split rims were the only tire rims he thought were dangerous to mount. Plaintiff could not recall the accident itself and testified he had not used ether to seat the beads.[4] The tire "exploded" as plaintiff was filling it with air, causing the tire to come off the wheel rim.[5] The tire and wheel rim struck plaintiff in the head.

Plaintiff sustained the following injuries: serious injuries to his brain, skull, forehead, jaw, nose, left ear; and plaintiff lost his left eye, hearing in the left ear, and seven teeth. Plaintiff testified, as a result of these injuries, he has trouble concentrating, suffers from incapacitating headaches, has little sense of smell, and has trouble breathing out of the right side of his nose. Plaintiff underwent a series of surgeries to reconstruct his face. His medical bills totaled $295,341.

Robert Ferris testified he was working with plaintiff at the time of the accident. Ferris testified they had lubricated the tire, seated the beads, and were ready to fill the tire with air. As plaintiff picked up the air hose, Ferris turned and walked away to work on a tire he had been repairing. Ferris testified while his back was turned, he heard a load noise, "more or less like a gun going off." When Ferris turned around, he saw plaintiff on his back, unconscious, and bleeding heavily. Ferris testified the tire plaintiff was inflating was lying close to him on the floor, as was the wheel rim, which was dented and had blood on it. Ferris testified he did not know how much air plaintiff had put in the tire before it "exploded." Ferris testified they had ether at the shop to help start diesel engines in cold weather, but said nobody at plaintiff's business, Archway Trench-

ing and Excavating ("Archway"), ever used ether to seat beads on a tire.

Dr. John Delfino, a maxillofacial surgeon, testified regarding the surgeries he performed on plaintiff. The initial surgery was to save plaintiff's life; the following surgeries were to reconstruct plaintiff's face. Delfino testified he saw no evidence of fire or heat damage to plaintiff's face.

### B. Lost Income

Plaintiff testified he founded Archway in 1975. In 1988, he made more than $200,000. Plaintiff testified he attempted to return to work in the spring of 1991, but had trouble operating heavy equipment because he had no depth perception as a result of the accident.

James England, a rehabilitation counselor, evaluated plaintiff's ability to return to work at Archway. England opined plaintiff's injuries made him unable to effectively manage Archway. England concluded plaintiff would need to find a simple repetitive type of job, one where he would probably earn $8,500 to $10,000 per year.

Wayne Stillings, a psychiatrist, testified plaintiff suffers from traumatic brain injury with associated cognitive deficits. He testified he recommended plaintiff stop operating Archway because "plaintiff presents a danger to himself and to other people." Mark Hoffman, a certified public accountant ("CPA"), testified plaintiff's total lost earnings, including past, present, and future income through age sixty-five, were $6,347,128.

### C. Plaintiff's Experts

Alan Milner, a metallurgical engineer, opined the tire had a manufacturing defect. Milner testified, assuming the tire was manufactured in 1967, "there's a design defect in

---

4. Goodyear claimed plaintiff used ether or another flammable substance to seat the beads on the tire. Several witnesses testified air pressure normally seats the tire. However, if the tire would not seat, a flammable substance, such as ether, could be used. The flammable substance is squirted on the tire then lit. When the flammable substance is ignited, pressure that results causes the tire to seat. There was testimony use of a flammable substance to seat tire beads is a known practice in the tire industry, but one that

is not recommended. Jury Instruction No. 11 instructed the jury to assess plaintiff a percentage of fault if the jury believed plaintiff used ether or another flammable substance to seat the beads.

5. Plaintiff characterizes this event as an "explosion;" Goodyear characterizes it as "bead or tire failure."

it, because it employs the multi-strand weft-less design which had been known at that time for many years to be prone to failure by this mechanism [chording or bead failure] ... at relatively low pressures." Milner testified manufacturing the bead using single-strand wire, rather than multi-strand wire, and wire .050" in diameter, rather than .037" in diameter, would have "eliminated essentially the potential for [the bead] to fail under these kinds of circumstances." Milner further testified the tire had a manufacturing defect, a lack of compactness to the bead, which made the bead "not as strong as it could be." Milner opined the bead in question was already broken, or substantially broken, when plaintiff purchased the tire, and the "explosion" occurred at low pressure because there was no damage to the rubber.

Virgil Flanigan, a professor of mechanical engineering, testified he examined the tire and wheel rim which struck plaintiff. Flanigan opined ether had not been used on the tire.

Dr. Frank Landy, who held a Ph.D. in industrial psychology and human factors, testified over Goodyear's objections that a warning should: (1) warn of the hazard; (2) warn of the consequences; and (3) tell how to avoid the hazard. Landy testified in his opinion, the Goodyear tire should have had a warning advising: (1) the tire could become airborne; (2) if it became airborne it could kill someone; and (3) secure the tire to prevent it from becoming airborne.

### D. Evidence of Goodyear's Prior Notice of Bead Failure

Plaintiff offered the following evidence to show Goodyear had knowledge, prior to the time this tire was sold, of the design and manufacturing defects that could cause the tire to fail as it did in this case. The trial court took judicial notice of *Ewer v. Goodyear Tire and Rubber Company*, 4 Wash. App. 152, 480 P.2d 260 (1971), an appellate court opinion from Washington state. The

plaintiff in *Ewer* brought suit for damages suffered when a tractor tire, manufactured by Goodyear in 1966, exploded during mounting. 480 P.2d at 262. At trial, Robert W. Ellis, then chief design engineer for Goodyear, testified Goodyear had tires sent back because of complaints about the beads. *Id.* at 262 n. 2. The trial court took judicial notice of and allowed into evidence five patents; two were issued to Goodyear and dealt with various methods of tire manufacturing. In 1963, Goodyear was issued the "Rudder patent," an invention to provide a bead which holds wires in a compact bundle. In 1965, Goodyear was issued the "Anderson patent," an invention to improve bead cores ("grommets") used to reinforce the bead area. Plaintiff introduced into evidence Goodyear memoranda from 1974–1977 discussing the dangers inherent in mounting tires and discussing the desirability of placing warnings on tires before they were sold.

### II. GOODYEAR'S EVIDENCE

Goodyear offered testimony of four individuals in the tire business, who sold both new and used tires, manufactured by a variety of companies including Goodyear. All four witnesses testified they never heard of the phenomena of chording of multi-strand weftless beads constructed of .037" diameter wire.[6]

Thomas Baker, of Baker Tire Analysts, testified he found no manufacturing or design defects in the Goodyear tire at issue. Baker opined plaintiff used gasoline or ether to facilitate mounting the tire and some of the fuel was ignited by the oxygen during the inflation process. Baker testified he concluded plaintiff used a flammable substance because of the soot found on the companion tire. Baker also opined plaintiff overinflated the tire.

Chester Stewart Patterson, a chemist with Goodyear since 1963, testified there was no design defect or manufacturing defect with the bead bundle. Patterson testified .050"

**6.** Tire Mart's expert, Wendell Kegg, testified he too had never heard of a similar type of bead failure in a mounting situation. Kegg testified plaintiff mounted the tire on a wheel rim that was too narrow. Kegg said plaintiff used a 8.25" rim when a 9.75" rim was recommended by the

Tire & Rim Association manual for 1967 (the year Goodyear claimed the tire was manufactured). Kegg further testified plaintiff had not properly lubricated the tire before attempting to inflate it.

wire was not available in 1967, and was not used in this country until 1972 or 1973. Patterson testified he found soot on the tire and was of the opinion a flammable substance was used to facilitate mounting the tire. Patterson testified six months into 1975 would have been as late as Goodyear could have sold the tire.

Bill Keenum, plaintiff's former employee, testified plaintiff told him ether could be used to facilitate mounting tires, but it was not something that should be done. Keenum testified he observed plaintiff use ether to mount tires in the past. Keenum denied plaintiff fired him.[7]

### III. THE VERDICT

The jury returned a verdict in favor of plaintiff and found his damages to be $7,800,-000. The jury found plaintiff 25% at fault, reducing his compensatory damage award to $5,850,000.[8] The compensatory damage award was subsequently revised to $5,000,-000, reflecting plaintiff's settlement with Tire Mart.[9] The jury also found Goodyear liable for punitive damages in the amount of $18,-400,000. Goodyear appeals the verdict in favor of plaintiff, raising eight points.[10] Plaintiff cross-appeals contending the trial court erred in calculating his compensatory damages.

### IV. GOODYEAR'S APPEAL

#### A. *Judicial Notice*

Goodyear's first point on appeal contends the trial court erred in taking judicial notice of *Ewer* and in allowing plaintiff's counsel to read to the jury selected excerpts from that

opinion. On appeal, Goodyear argues this was error for a host of reasons, including: (1) plaintiff failed to give reasonable notice of his intent to request judicial notice; (2) the opinion was not a proper subject of judicial notice because it was inadmissible hearsay and was misleading; (3) courts do not judicially notice records in one proceeding in deciding another; and (4) plaintiff did not establish the prerequisites for admission of former testimony in another case. We are not persuaded.

We note at trial plaintiff asked the court to take judicial notice of *Ewer*, claiming it was admissible

> ... for a whole lot of reasons. One, to show what [Goodyear's] knowledge was. To impeach the credibility of Mr. Patterson whose [sic] their corporate designee, says they didn't have any knowledge or know anything prior to '74. Goes to the issue of punitive damages, because they obviously knew and weren't doing a darn thing about it.[11]

Goodyear made the following objection: "I don't think that's proper to read from another reported decision in here.... I think its improper, this is the first time we've seen of this case. We at least want a chance to review this case." The trial court denied Goodyear's request for time to review the opinion, but stated if Goodyear produced information that it was not involved in *Ewer*, the court would order the evidence stricken and would order the jury to disregard it. The trial court thereafter took judicial notice

---

7. Ferris testified plaintiff fired Keenum.

8. The jury assessed fault as follows: Tire Mart, 0%; Goodyear, 75%; and plaintiff, 25%.

9. Although the jury found Tire Mart 0% at fault, the record indicates plaintiff settled with Tire Mart, for $850,000 after the case went to the jury.

10. We note Goodyear's appellate counsel differs from its trial counsel. From the record, it appears Goodyear's Ohio counsel, William Bartilson, and its local counsel, Karl D. Dexheimer and D. Kimberly Brown, conducted Goodyear's defense at trial.

11. The record does not support one reason given by plaintiff in support of his request the trial court take judicial notice of *Ewer*. Contrary to plaintiff's assertion, Patterson did not deny Goodyear had knowledge of bead failures prior to 1974. Instead, at his April 30, 1996 deposition, when asked if Goodyear had knowledge of individuals being injured or killed as the result of bead failures like the one here, Patterson testified, "Yes, in mounting situations, correct." When asked if Goodyear knew, as late as 1972, of the problems with beads and mountings which caused beads to fail, Patterson testified he personally was not but, "Obviously there was some discussion in '74 about it, so by then they were."

of *Ewer* and permitted plaintiff to explain and summarize the case for the jury.[12]

■ As an initial matter, we note the only objection Goodyear made to the introduction of *Ewer* at trial was it was "improper." Goodyear also requested additional time to review the case. On appeal, Goodyear seeks to expand its objection to the introduction of *Ewer* raising theories not presented to the trial court. This Court has stated points on appeal must be based upon the objection raised at trial, and parties may not broaden or change an objection on appeal beyond that made at trial. *Vaughn v. Ems*, 744 S.W.2d 542, 549 (Mo.App. E.D.1988). Accordingly, we decline to address those arguments raised by Goodyear for the first time on appeal.

■ We next address the sufficiency of the objection made by Goodyear at trial. "To preserve error, an objection to evidence must be sufficiently clear and definite so the trial court will understand the reason for the objection." *Blount v. Peipers*, 864 S.W.2d 392, 393 (Mo.App. E.D.1993). Here, Goodyear objected to the introduction of *Ewer* on the basis it was "improper" for a trial court to take judicial notice of an appellate court opinion. However, Goodyear failed to explain why it was improper for a trial court to take judicial notice of the case, especially in light of the reasons set forth by plaintiff in explaining its relevancy. Goodyear likewise failed to offer any law or rule in support of its request for additional time to review *Ewer*. While we question the means and manner employed by plaintiff when he offered *Ewer* into evidence, Goodyear simply offered no objection by which to preserve the matter for our review.

### B. *Submissibility of Case Against Goodyear*

■ Goodyear's second point on appeal is its allegation the trial court erred in submitting plaintiff's claim for failure to warn.

Goodyear argues there was no "competent evidence" it had knowledge or could have reasonably discovered the tire was dangerous at the time it entered the stream of commerce, or the lack of warning proximately caused plaintiff's injuries. Goodyear also contends evidence concerning warnings placed on Goodyear tires after the sale of the tire in question was irrelevant and inadmissible because it concerned other types of tires and embodied or reflected subsequent remedial measures.

■ In determining whether a submissible case was made, we review the evidence in the light most favorable to plaintiff, giving plaintiff the benefit of all reasonable favorable inferences and disregarding defendant's evidence except as it may aid plaintiff's case. *Klugesherz v. American Honda Motor Co.*, 929 S.W.2d 811, 813 (Mo.App. E.D.1996). Here, plaintiff's action alleged strict liability-failure to warn. The elements of a cause of action for strict liability-failure to warn are as follows: (1) defendant sold the product in question in the course of his business; (2) the product was unreasonably dangerous at the time of sale when used as reasonably anticipated without knowledge of its characteristics; (3) defendant did not give adequate warning of the danger; (4) the product was used in a reasonably anticipated manner; and (5) plaintiff was damaged as a direct result of the product being sold without an adequate warning. *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 13 (Mo.banc 1994). Goodyear contends plaintiff failed to establish two of the above elements, specifically, that the tire was unreasonably dangerous at the time of sale, and that plaintiff was damaged as a direct result of the tire being sold to him without a warning.

■ Plaintiff offered the following evidence the tire was unreasonably dangerous at the time of sale. As set out in greater

---

**12.** Plaintiff explained the procedural aspects of *Ewer* to the jury, noting *Ewer* was an appellate court opinion, and explaining appellate courts hear appeals from trial courts. Plaintiff told the jury the plaintiff in *Ewer* brought suit for damages suffered when a tractor tire, manufactured in 1966, exploded while he was putting it on the wheel rim. *See* 480 P.2d at 262. Plaintiff read

portions of the opinion which quoted Robert W. Ellis, chief design engineer for Goodyear. Ellis testified Goodyear had tires sent back with complaints about the condition of the beads; Goodyear felt this was a "witch hunt," so did the cheapest thing it could do, added wire to the beads, so Goodyear could say it was doing something and get off the hook. *See id.* at 262 n. 2.

detail above, plaintiff's expert, Milner, testified the tire had design and manufacturing defects. Additionally, plaintiff offered the following evidence Goodyear knew the tire was dangerous at the time the tire entered the stream of commerce: (1) Goodyear's memos written in the mid–1970's discussing the use of .050 wire, verses .037 wire, to make beads and the desirability of placing warning labels and safety precautions on tires;[13] (2) five patents, two which were issued to Goodyear before the tire in question was manufactured and which discussed improved methods of bead construction; and, (3) the *Ewer* opinion. Goodyear's claim there was no "competent" or "admissible" evidence the tire in question was dangerous at the time it was sold is, in essence, a challenge to the admission of its memos and the five patents, as well as another attack upon the admission of *Ewer.* With regard to the admission of the Goodyear memos, the record reveals Goodyear made the following objection to their introduction at trial:

> Your Honor, we'd like to renew our motion to object to the introduction of the documents. They are after the fact. They have nothing to do with this litigation. They don't add anything, but they do attempt to create a condition of prejudice with the jury. Some of the documents that he [plaintiff] seeks to introduce are not Goodyear documents, were not involved in Goodyear's internal operations.

We understand Goodyear's objection "they are after the fact" to be an objection to the memos because they postdated the manufacture of the tire in question. The problem

again is Goodyear's failure to explain why memos that postdated the sale of the tire were not admissible. Goodyear cited no law or rule in support of the objection. An objection to the admission of evidence must be specific to preserve a matter for appellate review. *Blount,* 864 S.W.2d at 393–94. Goodyear's objection was not sufficient to preserve the alleged error for appellate review.

With regard to Goodyear's claim the trial court erred in admitting the five patents, the record reflects Goodyear failed to object to the introduction of the patents. "An objection made for the first time on appeal will not be reviewed when not presented to and ruled on by the trial court." *Vaughn,* 744 S.W.2d at 549. As discussed more fully in point one above, Goodyear's objection to *Ewer* was not preserved for appeal.

Goodyear claims plaintiff failed to show he was injured as a direct result of Goodyear selling the tire without a warning. There are two separate requirements of causation in a failure to warn case: (1) the product for which there was no warning must have caused plaintiff's injuries; and (2) plaintiff must show a warning would have altered his behavior. *Arnold v. Ingersoll–Rand Co.,* 834 S.W.2d 192, 194 (Mo.banc 1992). With respect to the second component, there is a presumption plaintiff would have heeded the warning if plaintiff knew of the danger. *Id.* This presumption arises when there is sufficient evidence from which a jury could find plaintiff did not already know of the danger. *Id.* Therefore, a preliminary inquiry before

---

**13.** Exhibit 31 was a memo which discussed testing to compare burst values of experimental .050 gauge versus the current production .037 gauge wire bundles, and a recommendation to use .050 gauge for all bias tires.

Exhibit 34 was a memo dated April 24, 1974, which discussed Goodyear's opinion that "juries do not seem to be fully convinced that safety precautions get to the individuals who are doing the tire mounting," and the recommendation to print safety precautions on tire labels.

Exhibit 35 was a memo dated December 6, 1976, which discussed the cutoff date for using old tire labels that did not have warnings.

Exhibit 36 was a memo dated July 20, 1976, which discussed current tire label warnings.

Exhibit 37 was a memo dated March 18, 1976, which discussed the importance of including tire

mounting precautions and warnings on all passenger and truck tires.

Exhibit 38 was a memo dated March 14, 1974, which discussed the cost of adding precautionary statements to warning labels.

Exhibit 39 was a memo dated May 6, 1974, which discussed product liability and mounting problems, and recommended warnings and safety precautions be placed on tire labels.

Exhibit 40 was a memo dated April 26, 1974, which discussed printing safety precautions directly on the sidewall of the tire wall, and commenting that "the absence of adequate warnings on Goodyear tires is going to cost a lot of money since allegations of failure to warn are made in virtually all of the broken bead cases in which we are involved."

applying this presumption is whether adequate information concerning the danger was available to plaintiff, absent a warning. *Id.* It is not enough to show plaintiff knew of the general dangers associated with mounting tires; rather, Goodyear had to show plaintiff knew of this specific danger. *See Palmer v. Hobart Corp.*, 849 S.W.2d 135, 140 (Mo.App. E.D.1993).

Goodyear contends the above presumption was not available because plaintiff had adequate information, absent a warning, of the dangers involved here. Goodyear points out plaintiff testified he was aware of the dangers involved in mounting tires. However, Goodyear seeks to ignore the fact plaintiff also testified he was not aware of the specific danger of bead failure during mounting that might result in the tire and wheel becoming airborne. Therefore, we find plaintiff was entitled to the presumption he would have heeded a warning had it been given. Accordingly, the evidence reveals plaintiff made a submissible case that he was injured as a direct result of Goodyear selling the tire without a warning. Based upon the above, the trial court did not err in submitting plaintiff's claim for failure to warn to the jury.

## C. *Expert Witness*

Goodyear's third point on appeal is its claim the trial court erred in allowing plaintiff's expert witness, Frank Landy, to testify as to the required elements of an adequate warning, how people react to warnings, and the consequences of failing to warn. Goodyear argues Landy's testimony invaded the province of the court claiming the testimony instructed the jury on the required legal elements of a valid warning. Goodyear further argues Landy's testimony was speculative, was not based upon the facts in evidence, and constituted a legal opinion.

In a civil action, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert may testify thereto in the form of an opinion. RSMo section 490.065.1(1994); *Donjon v. Black & Decker (U.S.), Inc.*, 825 S.W.2d 31,

32 (Mo.App. E.D.1992). "In order for a witness to be qualified as an expert, it must be shown that by reason of education or specialized experience the witness possesses superior knowledge regarding a subject about which persons having no particular training are incapable of forming an accurate opinion or of drawing correct conclusions." *Id.* The determination of whether an individual qualifies as an expert witness, and whether his or her testimony is to be admitted, is a matter left to the sound discretion of the trial court and its ruling will not be disturbed on appeal absent a clear showing of abuse. *Id.*

Landy held a Ph.D. in industrial psychology and human factors, a field which studies the way people react to their environment. Landy had been a professor of psychology and human factors for twenty-five years and had written books and articles on the subject. Landy's testimony was based upon his years of experience studying how people react to warnings, not based upon speculation and conjecture. Warnings and how people react to warnings are arguably subjects about which persons having no particular training are incapable of forming accurate opinions. Based upon the above, the trial court did not abuse its discretion in finding Landy an expert regarding warnings and how people react to warnings, and allowing him to so testify.

Additionally, Goodyear made the following objection to Landy's testimony:

" . . . its our position again, Judge, that Mr. Landy is here in court to testify as a warnings expert. And as our [earlier] motion in limine states, he is not an expert in that area. He has no background whatsoever in the tire industry. . . . Knows nothing about tires, the background of tires. And he basically is not—his opinions are purely speculation and conjecture.

It appears Goodyear's argument was Landy was not qualified because he knew nothing about the tire industry. Assuming Landy did not know anything about the tire industry, this was not a basis to disqualify him. Landy was offered as an expert regarding warnings and how people react to warnings, which is the subject upon which he testified.

Landy was not offered as an expert in the tire industry. Landy's knowledge or lack of knowledge regarding the tire industry was not relevant to the issue of whether he was qualified to testify regarding warnings.

### D. Present Value Jury Instruction

██ Goodyear's fourth point on appeal alleges the trial court erred in refusing Goodyear's proffered damage instruction, Instruction B, instructing on the present value of plaintiff's future economic loss. Goodyear's argument is future damages should be valued at their present worth, as in Federal Employer's Liability Act (FELA) cases, otherwise it fails to take into account the earning power of money and results in a windfall to plaintiff. Goodyear also contends a present value instruction was necessary because plaintiff introduced an exhibit reflecting future damage payments at their present value, which confused the jury. We disagree.

██ The appropriate instruction on recovery of future damages in a comparative fault case is Missouri Approved Instruction 37.03, which was the instruction submitted. Where there is an applicable approved instruction, its use is mandatory, and it is error to deviate from MAI form. *Tillman v. Supreme Exp. & Transfer, Inc.*, 920 S.W.2d 552, 554 (Mo.App. E.D.1996).

Furthermore, Goodyear's argument that personal injury cases should be treated like FELA cases has been argued before and rejected. *See Kenton v. Hyatt Hotels Corp.*, 693 S.W.2d 83, 96 (Mo.banc 1985)(rejecting argument that jury in personal injury action should be instructed plaintiff's compensatory damages award would not be subject to income tax, as in federal FELA cases). Additionally, Goodyear's reliance upon *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371 (Mo.banc 1986), is misplaced. While Judge Blackmar stated, in a concurring opinion, "Our courts perhaps should consider whether an instruction on present worth of future loss, as required in FELA cases ... should be made available in other civil actions," this is not the law in Missouri. *Id.* at 389. It is not error to follow established law with respect to the denial of an instruction. *Kenton*, 693 S.W.2d at 96–97.

### E. Punitive Damages Instruction

██ Goodyear's fifth point on appeal alleges the trial court erred in refusing to grant a directed verdict on the issue of punitive damages, arguing plaintiff failed to make a submissible case for such an award. Goodyear's sixth point on appeal claims the issue of punitive damages was not properly submitted to the jury because the jury was not instructed such damages must be proven by "clear and convincing evidence." We conclude Goodyear's sixth point on appeal has merit and is dispositive on the issue of punitive damages and, therefore, decline to address Goodyear's fifth point on appeal.

At trial, Goodyear proffered its Instruction D, which read: "The burden is on the plaintiff to cause you to believe by *clear and convincing evidence* the allegations submitted in Instruction No. [15]." (emphasis ours). The trial court refused to give Goodyear's Instruction D, and instead, gave Instruction No.15, submitted by plaintiff, which read:

First, if you find in favor of plaintiff Kevin Cole and against defendant Goodyear Tire & Rubber Company ... and if you believe that at the time defendant ... sold the tire defendant ... knew of the defective condition and danger ..., or

if you find in favor of plaintiff Kevin Cole and against defendant ... and if you believe that at the time defendant sold the tire defendant knew of the danger ..., and

Second, if you believe that defendant ..., in one or more of the respects submitted in paragraph First, thereby showed complete indifference to or conscious disregard for the safety of others,

then in addition to any damages to which you may find plaintiff entitled ... you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant ... and to deter defendant ... and others from like conduct.

Goodyear takes issue with Instruction No.15 wherein it allowed the jury to award punitive damages without being instructed on the applicable burden of proof. Goodyear argues the burden of proof applicable to a

claim for punitive damages was "clear and convincing evidence." We agree.

Our Supreme Court recently announced punitive damages must now be established by "clear and convincing evidence." *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo.banc 1996).[14] The Court reasoned, "[b]ecause punitive damages are extraordinary and harsh," a higher standard of proof is required. *Id.* The Court announced this new standard would be applied prospectively, so would apply to "all cases in which trial begins after February 1, 1997, *and all pending cases in which a proper objection has been preserved.*" *Id.* (emphasis ours). *Rodriguez* was decided December 17, 1996, and rehearing denied on January 21, 1997. This case was pending as of the date *Rodriguez* was decided as the trial court had not ruled on Goodyear's motion for new trial.[15] *See Swanson v. D & R Enterprises*, 899 S.W.2d 134, 137 (Mo.App. S.D.1995). Plaintiff does not dispute that Goodyear preserved the matter for appeal. Accordingly, the trial court should have instructed the burden of proof for punitive damages in this case was "clear and convincing evidence."

Goodyear suggests the above error entitles it to a new trial on all issues. We disagree. *See Litchfield v. May Dept. Stores*, 845 S.W.2d 596, 598–99 (Mo.App. E.D.1992). We therefore reverse the judgment for punitive damages and remand the matter for a new trial on that issue alone.

### F. *Excessiveness of Verdict / Remittitur*

Goodyear's seventh and eighth points on appeal allege the trial court abused its discretion in refusing to enter remittitur of the compensatory damages and punitive damages awards. Goodyear contends the trial court abused its discretion in refusing to enter remittitur of the compensatory damages award claiming it exceeds fair and reasonable compensation for plaintiff's injuries, as it exceeds his economic damages by $3.2 million, and claiming it is out of line with similar cases. We disagree, having concluded punitive damages must be remanded for a new trial.

There is no exact formula for determining whether a verdict is excessive; instead, each case must be reviewed in light of the factors set out in *Magnuson by Mabe v. Kelsey–Hayes Co.*, 844 S.W.2d 448, 458 (Mo.App. W.D.1992). These factors include: " (1) present and future loss of income, (2) medical expenses, (3) plaintiff's age, (4) the nature and severity of the injuries, (5) economic factors, (6) awards given in similar cases, and (7) the superior opportunity of the trial court and jury to appraise plaintiff's injuries and other damages." *Id.* The trial court has broad discretion regarding whether to order remittitur. *Fust v. Francois*, 913 S.W.2d 38, 49 (Mo.App. E.D.1995). We exercise our power to interfere with a judgment with caution and will only interfere when the verdict is so grossly excessive it shocks the conscience of the court and convinces the court the jury and trial court abused their discretion. *Id.*

With the above standard of review in mind, and applying the factors set out about, we find the compensatory damage award was not "so grossly excessive it shocks the conscience of the court," and therefore find the trial court did not abuse its discretion in refusing to order remittitur. Plaintiff sustained life threatening and disfiguring injuries. His medical bills at the time of trial came to $295,341. Plaintiff was unable to continue working in the business he owned and operated before he was injured. Hoffman, a CPA, testified plaintiff's total lost earnings through age sixty-five to be $6,347,128. England, a rehabilitation counselor, testified plaintiff's future employment opportunities would be limited to simple repetitive work where he could earn $8,500 to $10,000 per year. Based upon these factors, the compensatory damages award of $7,800,000, reduced to $5,000,000, was not excessive.

---

**14.** Prior to the recent decision in *Rodriguez*, the burden of proof for punitive damages was "preponderance of the evidence." 936 S.W.2d 109–11.

**15.** On January 28, 1997, the trial court entered an order denying Goodyear's motion for new trial.

# 188

## V. PLAINTIFF'S CROSS-APPEAL

■ Plaintiff raises one point on cross-appeal. He claims trial court erred in granting Goodyear's petition to amend the judgment. More specifically, plaintiff argues the trial court erred in the manner in which it recalculated his compensatory damage award as it deducted his comparative fault from the total amount of his compensatory damages *before* it deducted the amount of his settlement with Tire Mart, rather than apportioning fault *after* the deduction for his settlement with Tire Mart. We disagree.

As stated above, the jury found plaintiff's total damages to be $7,800,000. The jury apportioned 75% fault to Goodyear, 25% fault to plaintiff, and 0% fault to Tire Mart. The trial court initially apportioned the $7,800,000 damages between plaintiff and Goodyear by reducing the $7,800,000 award by 25%, or $1,950,000, to reflect plaintiff's percentage of fault, with Goodyear liable for the remaining $5,850,000. Goodyear thereafter petitioned to have the compensatory damages award recalculated to give it credit for the $850,000 settlement plaintiff received from Tire Mart. Goodyear proposed plaintiff's comparative fault be deducted *before* deducting the $850,000 settlement with Tire Mart. Plaintiff proposed his comparative fault be deducted *after* deducting the $850,000 settlement. The trial court accepted Goodyear's proposed method in recalculating plaintiff's compensatory damages award.[16]

Plaintiff claims the method by which the trial court recalculated his compensatory damages was contrary to the method set out in *Jensen v. ARA Services, Inc.* 736 S.W.2d 374, 378 (Mo.banc 1987), in which the Court said deductions for amounts received from settling defendants must be taken off the total figure, before fault is apportioned. A review of *Jenson* indicates the case is not dispositive in this instance. *Jensen* involved a case where the settling defendants did not proceed to trial. In *Jensen,* the court reasoned because Missouri's verdict director does not apportion the total fault of all defendants, but rather only apportions fault between the *trial parties,* then we must conclude that the settling parties' fault is divided proportionately among the parties at trial. *Jensen,* 736 S.W.2d at 377–78. As stated above, Tire Mart proceeded to trial, and the jury returned a verdict finding Tire Mart 0% responsible for plaintiff's compensatory damages.

We also note, to recalculate his compensatory damages as plaintiff proposed would result in plaintiff receiving more than the jury found he was entitled to receive. The jury found his total actual damages to be $7,800,000 and plaintiff 25% at fault. Accordingly, the jury found plaintiff was entitled to a total of $5,850,000 for compensatory damages. Under the revised judgment, plaintiff will receive $5,000,000 from Goodyear and $850,000 from Tire Mart, for a total of $5,850,000, the amount the jury found he was entitled to receive for compensatory damages.

For the above stated reasons, we affirm the judgment with regard to all matters raised on direct appeal, with the exception of the punitive damages award, which we reverse and remand for new trial. We affirm the judgment of the trial court on the cross-appeal.

16. Goodyear petitioned the trial court for a credit in the amount of the $850,000 settlement with Tire Mart, proposing to revise the judgment as follows:

| | |
|---|---|
| Plaintiff's total actual damages | $7,800,000 |
| Less plaintiff's 25% comparative fault | −$1,950,000 |
| | =$5,850,000 |
| Less settlement with Tire Mart | −$ 850,000 |
| | =$5,000,000 |

Plaintiff proposed the judgment be revised as follows:

| | |
|---|---|
| Plaintiff's total damages | $7,800,000 |
| Less settlement with Tire Mart | $ 850,000 |
| | =$6,950,000 |
| Less plaintiff's 25% comparative fault | $1,737,500 |
| | =$5,212,500 |