**FABRICOR, INC., Respondent,**

v.

**E.I. DUPONT DE NEMOURS & CO. and Colt Industries, Inc., Appellants.**

**Nos. WD 53668, WD 53669, WD 53735.**

Missouri Court of Appeals, Western District.

April 4, 2000.

Motion for Rehearing and/or Transfer to Supreme Court May 30, 2000.

Application for Transfer Denied Aug. 29, 2000.

John A. Vering, III, Lee M. Baty, Theresa Otto, Kansas City, for appellant.

Stephen J. Dennis, Overland Park, for respondent.

Before HOWARD, P.J., BRECKENRIDGE and SPINDEN, JJ.

PATRICIA BRECKENRIDGE, Judge.

E.I. DuPont de Nemours & Co. (DuPont) and Colt Industries, Inc. (Colt), appeal from the trial court's judgment in favor of Fabricor, Inc., in Fabricor's action for tortious interference with a business expectancy against DuPont and Colt. On appeal, DuPont and Colt claim that the trial court erred by denying their motions for a directed verdict and judgment notwithstanding the verdict because Fabricor failed to prove that DuPont's and Colt's conduct was not justified by their own legitimate economic interests and that there was a causal connection between DuPont's and Colt's conduct and Fabricor's claimed loss of a business expectancy. DuPont and Colt also claim that the trial court erred by submitting the issue of punitive damages to the jury because Fabricor failed to prove that DuPont's and Colt's conduct was outrageous because of evil motive or reckless indifference to Fabricor's rights, and the trial court erred by refusing to instruct the jury that Fabricor was required to prove its punitive damages claims by clear and convincing evidence. In addition, Colt claims that the trial court erred by refusing to admit evidence of customer complaints regarding Fabricor which Colt received after September 9, 1992, because that evidence was relevant on the issue of justification.

This court issued an opinion on September 7, 1999, affirming the trial court's judgment in part and reversing in part. We granted DuPont's motion for rehearing to clarify certain factual matters and to reconsider our holding on the submissibility of Fabricor's claims for actual and punitive damages based upon DuPont's tortious interference with Fabricor's business expectancy. Again, this court finds that Fabricor presented substantial evidence of the elements of causation and absence of justification on its claim against DuPont. Therefore, the judgment for liability and actual damages against DuPont for tortious interference is affirmed. While this court finds that Fabricor made a submissible case for punitive damages, the trial court erred in instructing the jury on the standard of proof for punitive damages. The punitive damages award against DuPont is reversed and remanded for a new trial. Finally, this court holds that Fabricor failed to make a submissible case of tortious interference against Colt because Fabricor did not offer substantial evidence that it had a reasonable business expectancy. The judgment against Colt is reversed.

## I. Factual and Procedural Background

In accordance with the appellate standard of review, the following factual summary is presented in the light most favorable to Fabricor. *See Davis v. Board of Educ. of the City of St. Louis,* 963 S.W.2d 679, 684 (Mo.App.1998). In 1982, Barbara Summers incorporated Fabricor, a fabrication company located in Kansas City, Missouri. Ms. Summers is the sole shareholder and president of Fabricor. Since 1985, Fabricor has employed Ms. Summers' husband, Kent Summers, as operations manager. Fabricor specializes in interior casework and millwork, such as cabinets, countertops, bathroom vanities and fixtures. It purchases solid surface products and makes them into countertops and other fixtures by cutting the raw sheets, refining them, and placing edges on them. Fabricor or other contractors then install these countertops in residences and commercial enterprises. The process of cutting the raw sheets and re-

fining them into finished countertops is called "fabricating."

In the mid–1980s, Fabricor began purchasing Corian®, a DuPont solid surface material. Fabricators, such as Fabricor, do not buy Corian® directly from DuPont; rather, they purchase it from distributors. Fabricor originally purchased Corian® from Colt Industries, which at that time was one of two Corian® distributors for the geographical area in which Kansas City is located. During the year 1986, Fabricor purchased Corian® from the other distributor for the area. The next year, Fabricor was persuaded to return to Colt by Bob Lazarony, a sales representative for Colt, because Mr. Summers was impressed by Mr. Lazarony's helpfulness in passing new technology along to Fabricor and in assisting Fabricor in developing its residential business.

In 1989, Mr. Lazarony told Mr. and Ms. Summers about a program offered by DuPont known as the certified fabricator/installer (CF/I) program. Under this program, DuPont would certify fabricators and installers who were sponsored by a distributor in the fabricator's geographical area. CF/Is could advertise that they were certified by DuPont, and would benefit from DuPont's extensive marketing of Corian®. Another benefit was that a CF/I could buy Corian® from any distributor in the country at a lower price than was available to other customers. However, if a CF/I bought Corian® from a distributor outside the CF/I's geographical area for a project not located within that distributor's geographical area, the distributor had to pay a "passover" payment of ten percent to the distributor for the CF/I's home geographical area.

Colt sponsored Fabricor's successful application to become certified in DuPont's program. Ron Faught, territory manager for DuPont, Mr. Lazarony on behalf of Colt, and Ms. Summers, as president of Fabricor, executed a two-year CF/I contract that was in effect from October 13, 1989 until October 12, 1991. Fabricor, as

the CF/I, was obligated under the agreement to maintain "a high level of quality workmanship." When this first CF/I agreement expired, Mr. Faught and Ms. Summers executed a two-year renewal contract on December 12, 1991. This agreement, in the form DuPont was executing with its CF/Is in 1991, had the additional requirements that the CF/I "maintain a high level of customer service," "investigate and resolve customer complaints," and maintain a sound financial relationship with the CF/I's distributor.

The CF/I program was a part of DuPont's marketing plan to expand its sales of Corian®. Its marketing plan also included the active pursuit of national commercial accounts. In early 1992, DuPont negotiated a program with Marriott International whereby Marriott would specify Corian® for all its solid surface needs in its upscale hotels. DuPont guaranteed a ceiling price to Marriott and assured Marriott of the quality of its product and the quality of the workmanship of its system of fabricators and installers. DuPont also offered to provide Marriott with a list of distributor-recommended CF/Is to assist Marriott's general contractors in selecting a fabricator. The Marriott specifications guidebook encouraged its general contractors, when beginning the bidding process on a particular project, to call DuPont and receive a list of CF/Is in the area of the project. Marriott or its general contractor then had the option of contacting those CF/Is for pricing.

Information about DuPont's arrangement with Marriott was sent to the distributors, who forwarded it to the CF/Is. This program came to be known as the "Marriott offering." Fabricators interested in participating in the Marriott offering were directed to submit their name to their distributor who would forward the name to the DuPont coordinator of the CF/I list for the Marriott offering. This referral system was in place by October of 1992.

Prior to this time, Mr. Faught had displayed enthusiasm about Fabricor expanding its involvement in commercial work. When Mr. and Ms. Summers learned about DuPont's national campaign to install Corian® in Marriott hotels nationwide, they were very interested in procuring contracts for Fabricor. Mr. Faught knew of Fabricor's interest and encouraged Mr. and Ms. Summers to pursue the Marriott work. Although Mr. and Ms. Summers communicated their interest to Colt, Colt did not forward Fabricor's name to DuPont for inclusion on the CF/I list for the Marriott offering.

Colt's failure to recommend Fabricor as a CF/I for the Marriott offering resulted from difficulties which had developed in the relationship in late 1991. Colt was concerned with the timeliness of payments from Fabricor on its account with Colt. The terms of Fabricor's account with Colt were that payment was due thirty days from the shipment of the Corian®. During the course of their business dealings, however, Fabricor's account had never been paid within thirty days.

Fabricor had its own concerns regarding its relationship with Colt. Specifically, Fabricor had become displeased with the actions of Bob Lazarony, Colt's sales representative assigned to Fabricor. Fabricor believed Mr. Lazarony favored a competing fabricator, Top Master. Fabricor also thought that Mr. Lazarony had stopped conveying information concerning potential projects to Fabricor so it could bid.

Mr. and Ms. Summers, Charles Hrebec, president of Colt, and Max Koontz, sales manager at Colt, met on March 23, 1992, to discuss these concerns. Prior to the meeting, Mr. and Ms. Summers prepared an agenda of the issues they wished to discuss. The March meeting focused almost entirely on Colt's concerns over the timeliness of payments. Mr. and Ms. Summers were frustrated by the failure of Colt to address their concerns. Until this time, both Colt and DuPont had encouraged Fabricor to expand its commercial business. Unfortunately, the expansion of commercial accounts increased Fabricor's delays in paying their account with Colt, because commercial projects were usually slower to pay and required purchases in larger amounts. Fabricor requested some leeway in the timeliness of its payment of its account with Colt and a larger credit limit. Mr. Hrebec agreed to give Fabricor a small increase in its line of credit, but made no other concessions. Colt advised Mr. and Ms. Summers that it expected compliance with its terms for Fabricor's account that payment was due thirty days after the Corian® was shipped.

After the March meeting, Fabricor made an effort to improve its payment record. Despite Fabricor's improvement, its account was not current at thirty days. In May of 1992, Fabricor began purchasing some of its Corian® from Building Material Services (BMS) in Indianapolis, a distributor outside the geographical area. When Colt learned this, it was not pleased. Mr. Hrebec became concerned that Colt's account receivable from Fabricor was at risk, because Fabricor would have less motivation to pay its account if Colt was not its exclusive supplier. In addition, relationships between Colt's employees and Fabricor further declined. On June 10, Kent Summers wrote Mr. Koontz at Colt, with a copy to Mr. Faught, complaining that Mr. Lazarony gave Kent Summers' original design for a Corian® toilet partition to Top Master, so that Top Master could prepare a competing bid.

In August, Colt sent a letter advising Fabricor that if Fabricor did not pay all charges to its account within thirty days, Colt would terminate the relationship. Mr. and Ms. Summers, Mr. Hrebec and Mr. Koontz met again in August of 1992. At this meeting, Colt was again interested only in discussing payment of its account, while Mr. and Ms. Summers wanted to discuss Fabricor's relationship with Colt and its employees. Mr. and Ms. Summers believed that since the beginning of the year, Colt's desire that Fabricor bring its

account current had increased greatly and Colt was making demands for prompt payment more frequently. Contrary to Mr. and Ms. Summers' earlier request that Colt give them more leeway during this period of Fabricor's growth, Colt was requiring that Fabricor do more to secure its financial position. During the August meeting, Colt demanded that Fabricor give security for its account in the form of a letter of credit, a personal guaranty or a Uniform Commercial Code filing. Ms. Summers agreed to give a letter of credit and then changed her mind some time after the meeting. Fabricor did file an application for credit with Colt, but did not provide Fabricor's financial information.

On September 9, 1992, Colt sent a letter to Fabricor advising it that Colt was ceasing its sales to Fabricor. Colt stated that it was discontinuing its business relationship with Fabricor because Fabricor repeatedly failed to keep its account current even after being warned that failure to make timely payments would result in termination of the business relationship; Fabricor failed to communicate with Colt; and Mr. and Ms. Summers treated Colt's employees with disrespect. Colt also noted that, although not controlling in its decision, recent complaints about the quality of Fabricor's work were a factor in its decision. Colt advised Fabricor that it would continue to do business with Fabricor on existing projects only through the end of the year. During this period, all sales would be COD, plus 50% to be credited on Fabricor's account payable. According to Mr. Hrebec, the reason Colt chose to discontinue its business relationship with Fabricor was primarily because of credit issues and the fact that Fabricor was doing business with BMS and other distributors.

Shortly after Colt notified Fabricor that it would no longer supply Corian® to Fabricor after December of 1992, Mr. Faught of DuPont wrote BMS, Fabricor's other major supplier of Corian®. In the letter dated September 22, 1992, Mr. Faught informed BMS that if it continued to supply Fabricor, when Fabricor was not in its geographical marketing area, BMS would be assuming certain obligations in respect to marketing efforts and servicing in Fabricor's geographical marketing area. Specifically, Mr. Faught advised BMS that if it continued to sell to Fabricor, it would be responsible for providing the twenty to twenty-five dealers who use Fabricor with "showroom display discounts, Yellow Pages costs, professional choice training, advertising, literature and samples, [and] complaint handling." The letter went on to say:

It will be my job to assure that all these items are maintained and will expect the residential specialist from BMS–Indianapolis to spend significant time supporting our programs with these authorized dealers. As you can see, this becomes a very complicated time-consuming operation that hopefully will not result in reduced Corian sales in the Kansas City or Indianapolis markets. My major concern is the stability of the Kansas City market and that our national marketing program is implemented and carried out on a consistent basis.

I realize that you have a difficult decision around the expense and time associated with servicing a fabricator outside your GMA. I hope this answers all your questions. If not, please call if I can be of more assistance.

With the exception of the representation that BMS would have to handle complaints if it sold Corian® to Fabricor, Mr. Faught's representations in the letter were false because Colt was providing these support services to dealers who used Fabricor. In fact, the purpose of BMS paying the ten percent passover fee to Colt was to reimburse Colt for providing these services.

After DuPont sent BMS this letter, Fabricor successfully bid for a Marriott renovation project, despite Fabricor's problems with Colt and its exclusion from the CF/I

list for the Marriott offering. This project, the Kansas City International Airport Marriott (KCI Marriott), was to be completed in the spring of 1993. Fabricor submitted its bid on February 8, 1993, through Forrest Harris of Harris Sales. Harris Sales is a business that connects factories or suppliers with persons interested in purchasing their product by assisting in the negotiation of price and overseeing the delivery of the product or service. Mr. Harris's ability to bid on Marriott renovations resulted from his extensive previous business relationship with Marriott. Marriott would send Mr. Harris a list of general contractors who were bidding on a job so he could participate in the bidding process. Fabricor used Mr. Harris as a link to Marriott on the Kansas City job and on other Marriott projects.

Fabricor learned shortly before March 9, 1993, that it was the successful bidder for the Corian® work at the KCI Marriott project, and it immediately attempted to obtain a supply of Corian®. In preparation for bidding, Fabricor had requested Marriott pricing from both Colt and BMS, but it had not advised those distributors that it was bidding on the KCI Marriott project. Because Marriott had a tight schedule on the KCI Marriott, the vanity tops were needed, according to Mr. Harris, in an "unbelievably quick amount of time." Specifically, the general contractor required delivery of fabricated vanity tops during the third week of March. Mr. Summers contacted Mr. Faught by phone and fax to advise him that Fabricor had received the KCI Marriott bid and to ask for his assistance in obtaining the necessary amount of Corian®. Mr. Faught did not respond to Mr. Summers' inquiries even though he acknowledged that he routinely assisted CF/Is in promoting their businesses. When Fabricor could not find a supplier of Corian® for the KCI Marriott project, it filed a lawsuit against Colt,·

DuPont and Top Master alleging, *inter alia,* a breach of the CF/I agreement.[1]

Fabricor also notified Mr. Harris of its inability to get material. Mr. Harris immediately informed the Marriott general contractor of the problem because he was concerned about his obligation to perform on his contract with the general contractor. A short time later, Mr. Harris received a phone call from a salesman for Colt who indicated that he understood that Mr. Harris had the contract with the general contractor on the KCI Marriott project and that Colt would like to do business with Mr. Harris. When Mr. Harris advised the Colt employee that he already had a fabricator, but that he would like help in getting the DuPont discount on material so his fabricator could pass it along to the general contractor, the Colt employee advised Mr. Harris that Colt only did business with Top Master.

Mr. Harris attempted to assist Fabricor in obtaining the Corian® by requesting DuPont's help. He called Mr. Faught but was able only to leave a message. In response, he received a call from DuPont's attorney, Adrian Yakob. During this conversation, Mr. Yakob stated, "We do not choose to do business with Fabricor; why don't you go to another one of our certified fabricators." Mr. Harris also called Trevor Murphy, business development manager for DuPont, who had negotiated the Marriott national account. Mr. Murphy was very negative and stated that he would rather not get involved. At some point in the process of securing material, Mr. Harris was told by Mr. Murphy, Robert Simonson, director for Marriott's capital expenditure program, or Phil Goodman, the Marriott general contractor· on the KCI Marriott project, that Fabricor could not perform the KCI Marriott project because it was not a certified fabricator. Mr. Harris immediately called Mr. Summers. After Fabricor's attorney called DuPont, Mr. Harris received a letter from Mr. Ya-

---

1. Fabricor voluntarily dismissed the lawsuit on April 26, 1993, after it had obtained the Corian® it needed to complete the KCI Marriott project.

kob verifying that Fabricor was still a CF/I.

Simultaneously with Mr. Harris's efforts, Mr. Simonson of Marriott also was attempting to assist Fabricor in obtaining Corian®. Mr. Simonson first became aware of the supply problem for the KCI Marriott project through Phil Goodman, the KCI project's general manager, who had been alerted to the problem by Mr. Harris. Mr. Goodman told Mr. Simonson that the fabricator was having difficulty getting the product necessary to make the vanity tops. He informed Mr. Simonson that Fabricor might not be able to meet the production schedule. In response, Mr. Simonson contacted Mr. Murphy and expressed his dissatisfaction with DuPont. Mr. Simonson even threatened to stop using Corian® products in its renovation projects. He asked Mr. Murphy why, if Fabricor was a certified fabricator, the product was not going to be made available. Mr. Murphy responded that DuPont had the product and there would be no problem getting the product supplied to the KCI Marriott project if the general contractor would choose a different CF/I. Mr. Murphy explained that there was pending litigation involving the fabricator and there were financial problems between the distributor and the fabricator. Specifically, Mr. Murphy told Mr. Simonson that Fabricor owed Colt for other projects, that there was a payment or collection issue, and that Colt was hesitant to supply material for the KCI Marriott project to Fabricor. At the time of this statement, however, Fabricor did not owe any money to Colt, and Fabricor had the financial ability to obtain a supply of Corian® from another distributor. Rather, the evidence indicates that Fabricor's problem in obtaining the Corian® for the KCI Marriott project was the result of DuPont's unwillingness to assist Fabricor in obtaining the material at the special Marriott price rate within the short time frame required by Marriott.

Around this time, Mr. Simonson was also told by Mr. Yakob that DuPont would provide the product if only Marriott would use an alternative fabricator. In response to the suggestions that a different CF/I be used, Mr. Simonson told the general contractor, Mr. Goodman, that Mr. Goodman had no reason to select a different fabricator and would be "stupid" to do such a thing. Mr. Simonson believed that, while the selection of a different CF/I might be in DuPont's best interest, it was not in Marriott's best interest.

In communications between Mr. Simonson and Paul Clegg, Mr. Murphy's supervisor at DuPont, Mr. Simonson offered to guarantee payment so that Fabricor could receive a supply of Corian®. Mr. Simonson testified that, while offered, no such guarantee was actually made on Fabricor's behalf. Fabricor had the financial ability to obtain the supply without any help from Marriott and did obtain the Corian® needed for the project primarily through BMS. BMS decided to supply Fabricor because of the "volume of prospective purchases" Fabricor could offer BMS. The KCI Marriott project was completed without delay.

Marriott was pleased with Fabricor's performance of the KCI Marriott renovation. While there was a problem concerning the failure of the adhesive that attached the aprons to the front of the vanities, the adhesive was supplied by the general contractor, not Fabricor. Nevertheless, Fabricor fixed the problem. When Mr. Faught heard there had been a question regarding whether the installation was being done properly, he directed BMS to send an inspector to the KCI Marriott to look at the fabrication job of Fabricor. Mr. Harold Kolb, the BMS employee who did the inspection, could not detect any problem with the installation of the Corian® vanities. He reported that fact to Mr. Faught.

As a result of Marriott's experience with the KCI Marriott project, Mr. Simonson had concerns regarding the reliability of Marriott's supply of Corian® from DuPont. Mr. Simonson did not want to continue to do business with DuPont and in-

formed DuPont of that fact. To address Marriott's dissatisfaction with the reliability of its supply of Corian®, Marriott and DuPont began discussing an arrangement by which Marriott would purchase fabricated Corian® directly from DuPont. Mr. Simonson testified that Marriott was interested in the direct purchase arrangement because Marriott had other direct purchasing programs in place and Marriott felt that, by buying the product directly from DuPont, it would maintain control of the renovation process and avoid situations such as the KCI Marriott project.

Under the direct purchase arrangement, DuPont negotiated to have a "converter," rather than a CF/I, convert the raw Corian® into fabricated products for sale to Marriott, with DuPont selecting the converter candidates. The fabricated Corian® would then be installed by the Marriott general contractor into the renovation project. Mr. Murphy testified that DuPont chose Cramer Cabinets from Pittsburgh, Pennsylvania, as the converter. Mr. Simonson testified that there was never a written agreement signed—just a price list—and that the Marriott project manager could still choose whether to use the direct purchasing program. In fact, after the direct purchasing program was implemented, there were occasions when vanity tops were fabricated by someone other than the converter chosen by DuPont. The direct purchasing procedure was first proposed at a meeting in April 1993, but was not implemented until the end of 1993.

During the remainder of 1993, Fabricor, bidding through Harris Sales, supplied vanity tops for Marriott projects in Atlanta, Georgia; Greensboro, North Carolina; Cambridge, Massachusetts; and Rochester, New York. There were no quality or scheduling problems on these projects. On the Greensboro job, Marriott wanted the project completed in thirty days, so the general contractor told Mr. Summers that he needed the vanity tops in two weeks. Because DuPont could not ship the material in less than four weeks, Fabricor took vanity tops out of its inventory for the Atlanta project to meet the Greensboro schedule. On the Atlanta renovation, a delayed shipment caused the builders to use certain vanity tops that had been fabricated for one purpose for another, resulting in a shortage of a specific size of vanity top. While there was disagreement over who was responsible for this mistake, Fabricor replaced the tops within the scheduled time. Thus, there were no delays on the Atlanta project attributable to Fabricor. Mr. Harris testified that general contractors continued to accept bids from Fabricor for Corian® work after these projects because the general contractors felt that Harris and Fabricor were a reliable source of raw materials and were performing as expected.

During Fabricor's work on the Atlanta and Greensboro projects, however, Marriott received communications from DuPont concerning Fabricor's financial ability to perform for Marriott. James Goebel, the project manager for Marriott's capital expenditure program construction on the Atlanta renovation, remembers having discussions with Mr. Murphy during which Mr. Murphy represented that Fabricor did not have the ability to pay for materials from DuPont.

Toward the end of 1993, Fabricor submitted bids through Mr. Harris for Marriott work on the J.W. Marriott project in Washington, D.C., the Key Bridge project, the Newton, Massachusetts project, and the Philadelphia Convention Center. The general contractor for the J.W. Marriott project in Washington, D.C., proposed to Mr. Simonson that Fabricor's bid be accepted. Mr. Simonson was the ultimate decision-maker on the subcontractors for Marriott reconstruction projects. When the general contractor informed Mr. Simonson that Fabricor had been chosen, Mr. Simonson was concerned that Fabricor had scheduling problems and it was "risky" whether Fabricor could purchase the raw material quickly enough to comply

with the aggressive schedule for the J.W. Marriott project. So, Fabricor was not chosen. Additionally, when Mr. Harris submitted a bid for the same renovation using Fabricor as the Corian® fabricator, Mr. Simonson told Mr. Harris that Marriott had a problem using Fabricor.

The next significant event was when Ms. Summers received a letter, dated September 10, 1993, from Robert Wheatley, the Distributor Manager of Corian® for DuPont, informing her that "DuPont has decided that we no longer require your services in the Kansas City market as a Corian® CF/I, and therefore will not renew the Corian® Certified Fabricator/Installer Agreement with Fabricor when it expires on it's [sic] own terms as of December 12, 1993." In response to this letter, Mr. Summers wrote Mr. Wheatley on behalf of Fabricor, requesting that Mr. Wheatley reconsider the termination of the CF/I agreement and consider other alternatives DuPont might be willing to consider with Fabricor and Corian® distribution. When Mr. Wheatley received Mr. Summers' letter, he sent a memorandum on September 30, 1993 to William Fleming, DuPont's national manager of distribution, stating, "This guy Kent Summers is *really bad* news. We have already notified him that his CFI status will not be renewed. Is there a legal way that we can advise our *entire* distribution network that we do not want him to fabricate Corian again. He is giving us a black eye." Attached to this memorandum was a customer complaint regarding a project in which Fabricor had supplied the fabricated Corian®. The evidence indicated, however, that the majority of problems mentioned in the customer complaint related to the installation, rather than the fabrication, of the Corian® used in that job. Fabricor had not installed the Corian® on that project. Nevertheless, as soon as Mr. Summers was notified of the complaint, he immediately sent a technician to correct the problems.

In response to Mr. Summers' correspondence, Mr. Fleming wrote Mr. Summers to inform him of the basis for DuPont's decision. Mr. Fleming indicated that "[f]rom time to time DuPont reviews its Certified Fabricator base and, for reasons of its own, decides to increase or reduce its representation in a particular area." According to Mr. Fleming, because of changes in the needs of the region's market, DuPont decided to terminate Fabricor's certified fabricator status. Finally, Mr. Fleming told Mr. Summers to contact Fabricor's traditional suppliers of Corian® in order to obtain materials for any existing contractual commitments. After DuPont discontinued Fabricor's certified fabricator status, however, BMS determined in December of 1993 that the responsibilities BMS had to undertake to continue doing business with Fabricor were too onerous. So, BMS discontinued supplying Corian® to Fabricor.

Subsequently, Fabricor filed a four-count petition against DuPont and Colt in the Circuit Court of Jackson County. In its first count, Fabricor contended that DuPont had violated the notice provision of Missouri's franchise statutes. In its second count, Fabricor alleged that DuPont breached the CF/I agreement by terminating and/or not renewing the agreement upon its expiration. As its third count, Fabricor claimed that DuPont had breached an implied covenant of good faith and fair dealing. In counts four and five, Fabricor claimed that both DuPont and Colt tortiously interfered with Fabricor's business expectancy. The trial court entered summary judgment in favor of DuPont on counts one and two and granted DuPont's motion for a directed verdict as to the third count. The contentions contained in Fabricor's first, second, and third counts are not issues on appeal. The only claims submitted to the jury were Fabricor's claims against DuPont and Colt of tortious interference.

The jury returned a verdict in favor of Fabricor on its claims of tortious interfer-

ence against DuPont and Colt. The jury awarded Fabricor $148,575 in compensatory damages against DuPont and Colt. In addition, the jury awarded Fabricor $86,925 in punitive damages against Colt and $569,583 in punitive damages against DuPont. After the trial court denied both DuPont's and Colt's motions for judgment notwithstanding the verdict, both DuPont and Colt filed timely appeals in this court. These appeals have been consolidated in this proceeding.

## II. Standard of Review

■ DuPont's and Colt's contentions that the trial court erred in denying a judgment notwithstanding the verdict raise the issue of whether Fabricor made a submissible case, *Davis*, 963 S.W.2d at 684, because a judgment notwithstanding the verdict is appropriate only when a claimant has not made a submissible case. *Winkler v. Robinett*, 913 S.W.2d 817, 821 (Mo.App.1995). "A submissible case requires substantial evidence for every fact essential to liability." *Davis*, 963 S.W.2d at 684. " 'Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case.' " *Id.* (quoting *Hurlock v. Park Lane Med. Ctr., Inc.*, 709 S.W.2d 872, 880 (Mo.App.1985)). "Whether evidence in a case is substantial and whether the inferences drawn are reasonable are questions of law," *id.*, and are reviewed *de novo*. *Caudill v. Farmland Indus., Inc.*, 919 F.2d 83, 86 (8th Cir.1990).

■ "In determining whether a plaintiff has made a submissible case, we view the evidence in the light most favorable to the plaintiff and give the plaintiff the benefit of all reasonable and favorable inferences to be drawn from the evidence." *Davis*, 963 S.W.2d at 684. "The evidence and inferences must establish every element and not leave any issue to speculation." *Id.* A judgment notwithstanding the verdict should be granted only if there is no room for reasonable minds to differ on the issues. *Id.* Additionally, this court is not to supply missing evidence or give the plaintiff the benefit of unreasonable, speculative, or forced inferences. *Id.*

## III. DuPont's Appeal

### A. Fabricor Made a Submissible Case of Tortious Interference Against DuPont

■ In its first two points on appeal, DuPont claims that the trial court erred by denying its motions for directed verdict and judgment notwithstanding the verdict because Fabricor failed to sustain its burden of producing substantial evidence for its claim for tortious interference. "Tortious interference with a contract or business expectancy requires proof of: (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo. banc 1993). *See also Community Title Co. v. Roosevelt Federal Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. banc 1990). Specifically, DuPont argues in its first two points that Fabricor did not produce substantial evidence with regard to the third and fourth elements. These two points will be addressed jointly.

### 1. Fabricor Presented Sufficient Evidence of Causation

■ DuPont argues on appeal that Fabricor did not produce substantial evidence that DuPont caused the harm claimed. To establish the third element of a tortious interference claim, the plaintiff must show that the defendant's acts induced or caused a breach of the relationship. *Nazeri*, 860 S.W.2d at 316. To determine if the defendant's acts caused the breach, the 'but for' test is applied. *A.L. Huber & Son, Inc. v. Jim Robertson Plumbing, Inc.*, 760 S.W.2d 496, 499 (Mo.App.1988). To determine whether the 'but for' test is met, a two-step approach is used: "1) did [defendant]

actively and affirmatively take steps to induce the breach; and, if so, 2) would the contract[ ] have been performed absent the [defendant's] interference?" *Community Title*, 670 S.W.2d at 905.

■ With regard to the first step, the plaintiff must show that the defendant induced the breach. Induce is defined as "to move and lead (as by persuasion or influence), to inspire, call forth or bring about by influence or stimulation." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 594 (10 th ed.1994). Fabricor's evidence demonstrated that DuPont took steps to induce the breach of the relationship between Fabricor and Marriott. During the KCI Marriott project, two different DuPont employees urged Marriott and Forrest Harris to choose a different fabricator. In so doing, one of DuPont's employees misrepresented to Marriott that the reason that Fabricor could not perform was because Fabricor had financial difficulties with its distributor. Specifically, DuPont advised Marriott that Fabricor owed Colt, when in fact, Fabricor did not owe Colt any money at the time of the statement.[2] The evidence showed that Fabricor had the financial capability to perform during the KCI Marriott project and any representations by DuPont to the contrary were false.

After the KCI Marriott project, DuPont continued to make misrepresentations to Marriott that Fabricor was having financial problems. Specifically, Marriott received communications from Mr. Murphy on more than one occasion during the Greensboro and Atlanta projects that Fabricor did not have the ability to pay for materials from DuPont. There was no basis in truth for Mr. Murphy's statements. This course of action by DuPont was evidence that DuPont took steps to influence Marriott to end its relationship with Fabricor.

■ Having shown that DuPont attempted to induce the breach, Fabricor also had to show that the conduct caused the breach. Here, Fabricor introduced no direct evidence to prove this element, but did introduce much circumstantial evidence. " 'Facts necessary to sustain a recovery may be proved by circumstantial evidence.' " *Phelps Foundation v. Custom Ins. Co.*, 977 S.W.2d 33, 37 (Mo.App.1998) (quoting *Steward v. Goetz*, 945 S.W.2d 520, 528 (Mo.App.1997)). For circumstantial evidence to be sufficient, it must be " 'such that the facts necessary to support a verdict may be inferred and must reasonably follow, the existence of such facts may not depend upon guesswork, conjecture and speculation, and the evidence should have a tendency to exclude every reasonable conclusion other than the one desired.' " *Id.* (quoting *Steward*, 945 S.W.2d at 528). The evidence demonstrated that Marriott was pleased with Fabricor's performance in fabricating the vanity tops. After the KCI Marriott project, Fabricor continued to be selected as a subcontractor for four other Marriott projects. Fabricor had the financial ability to obtain the Corian® needed for the projects, as it made every production deadline Marriott established. No quality issues concerning Fabricor work were ever ultimately attributed to Fabricor. In fact, both Marriott and its general contractors always expressed satisfaction with Fabricor's work.

The general contractor on the J.W. Marriott project in Washington, D.C., selected Fabricor as the subcontractor on that project. Yet, Marriott chose not to approve Fabricor even though Marriott had a reputation in the industry of staying with businesses who had provided quality work in the past. The reason given by Marriott for declining to select Fabricor was Mar-

---

2. In its attempt to demonstrate the truth of its statements regarding Fabricor's financial difficulties, DuPont suggests that the only reason Fabricor obtained a supply of Corian® for the KCI project from BMS was because Marriott offered to guarantee payment on behalf of

Fabricor. The record demonstrates that while Marriott offered to guarantee payment, no guarantee was actually made. In fact, BMS testified that the decision to supply Fabricor was made because of the potential volume of business Fabricor could offer BMS.

riott's concerns over Fabricor's ability to meet scheduling deadlines. Mr. Simonson, who made this decision on behalf of Marriott, was worried that Fabricor did not have the financial ability to purchase raw material quickly enough to meet Marriott's construction schedules, as was misrepresented to Marriott by DuPont. If Marriott had not had such concerns, all evidence suggests that Marriott would have accepted the general contractor's recommendation of using Fabricor.

This evidence is sufficient to remove the case from the realm of conjecture. DuPont argues, however, that the relationship between Marriott and Fabricor ended as a consequence of the direct purchase agreement between Marriott and DuPont for the supply of Corian® which bypassed the use of subcontractors such as Fabricor. Yet, the evidence showed that the use of the direct purchase agreement was optional on the part of Marriott and that Marriott continued to use CF/Is for different projects. Viewing the evidence in the light most favorable to the plaintiff, such evidence is sufficient to create an issue of fact for the jury to resolve.

DuPont also argues that even if misrepresentations regarding Fabricor's financial ability to perform were made by DuPont at the time of the KCI Marriott project, evidence was introduced that Marriott independently checked Fabricor's financial ability by requesting a report from Dun & Bradstreet before awarding the Atlanta project to Fabricor. DuPont asserts that if a party makes an independent investigation, it will be presumed that the party relied upon that investigation and not the misrepresentation. This principle has been applied to bar a party who makes the independent investigation from asserting a negligence claim against the party who made the misrepresentation. *See Consumers Co-op. Ass'n v. McMahan*, 393 S.W.2d 552, 556 (Mo.1965). That is not the case here, as Marriott is not asserting a claim against DuPont. Moreover, the evidence indicates that although Marriott may have obtained the Dun & Bradstreet report, the cumulative effect of all of DuPont's misrepresentations regarding Fabricor's financial ability led Marriott to end its business relationship with Fabricor after the completion of the Greensboro and Atlanta projects. Fabricor presented sufficient evidence on the element of causation.

## 2. Fabricor Presented Sufficient Evidence that DuPont Lacked Justification for Interfering with Fabricor's Relationship with Marriott

DuPont next argues that it was justified in interfering with Fabricor's relationship with Marriott because DuPont was attempting to protect its business relationship with Marriott. DuPont is correct that if a defendant has a legitimate interest, economic or otherwise, in a contract or expectancy sought to be protected, then to demonstrate an absence of justification, the plaintiff must show that the defendant employed improper means in seeking to further only its own interests. *Community Title*, 796 S.W.2d at 372; *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 408 (Mo.App.1996). For purposes of tortious interference with a business expectancy, "improper means are those that are independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or any other wrongful act recognized by statute or the common law." *Id.* at 408.

Fabricor asserts that it did introduce sufficient evidence for a jury to find that DuPont used improper means by misrepresenting factual information regarding Fabricor. The evidence demonstrates that DuPont actively and affirmatively communicated to Marriott false information about Fabricor's financial ability to perform for Marriott. First, when Mr. Simonson contacted DuPont about the supply problem with the KCI Marriott renovation, Mr. Murphy told him that Fabricor owed its distributor, Colt, for past projects which was preventing Fabricor from obtaining

Corian®. At that time, however, Fabricor no longer owed Colt on any account, and Fabricor had the financial ability to obtain a supply of Corian® from another distributor. Second, on more than one occasion, Mr. Murphy had discussions with Mr. Goebel, the project manager for the Atlanta project, in which Mr. Murphy stated that Fabricor did not have the financial resources to perform for Marriott. Fabricor, however, had never missed a Marriott deadline on any contract Fabricor had been awarded. In fact, the evidence indicates that any difficulties Fabricor incurred in obtaining Corian® for the Marriott projects were the result of the short time deadlines of Marriott and the length of time DuPont needed to ship orders under its special Marriott pricing.[3]

■ "False statements tending to prejudice or injure a person in the person's business, by suggesting the person is unreliable, insolvent, or the like, are independently actionable and constitute an improper means." *Kerr Const. Paving Co., Inc. v. Khazin*, 961 S.W.2d 75, 80–81 (Mo. App.1997). Regardless of DuPont's reason for interfering with Fabricor's business relationship with Marriott, when DuPont made false statements with regard to Fabricor's financial ability to perform, it employed improper means in interfering in the relationship. Therefore, it is irrelevant whether DuPont was acting to protect its own legitimate economic interest, because under the law of tortious interference, one is never justified in using improper means to interfere with another's business relations. *Id.* at 80.

In light of this evidence, this court finds that Fabricor presented substantial evidence on the elements of causation and lack of justification to make a submissible case on its claim of tortious interference. The evidence was sufficient for the jury to

find that DuPont caused the breach of the relationship between Fabricor and Marriott. The evidence was also sufficient for the jury to find that DuPont tortiously interfered with Fabricor's business relationship with Marriott by improper means when DuPont made false representations to Marriott. Therefore, DuPont's first and second points are denied.

## B. Fabricor's Punitive Damages Claim Against DuPont

In its last two points on appeal, DuPont addresses the issue of punitive damages. In its third point, DuPont argues that the trial court erred in submitting the issue of punitive damages to the jury because Fabricor did not present substantial evidence that DuPont's conduct was outrageous because of evil motive or reckless indifference to the rights of others. In DuPont's final point, DuPont argues that the trial court erred in instructing the jury that punitive damages must be proved by a preponderance of the evidence instead of by clear and convincing evidence.

### 1. Fabricor Made a Submissible Claim for Punitive Damages Against DuPont

The first issue raised by DuPont regarding punitive damages is whether Fabricor made a submissible case. In reviewing the issue of submissibility, this court looks "at the evidence which is favorable to the submission of punitive damages, disregarding all evidence and inferences which are adverse thereto." *Ross v. Ford Motor Credit Co.*, 867 S.W.2d 546, 555 (Mo.App.1993). Only evidence that tends to support the submission should be considered. *Id.*

■ For intentional tort cases, "[p]unitive damages require a showing of a culpable mental state on the part of the defendant, either by a wanton, willful or

---

**3.** Although Marriott needed the finished vanity tops on site within three to four weeks after awarding the contract, DuPont was unable to get the unfinished Corian® to Fabricor by that time. DuPont would not sell more mate-

rial at the special Marriott price rates than what was specifically required for a job, therefore, Fabricor did not have an inventory of product on-hand to use for the Marriott projects.

outrageous act or reckless disregard (from which evil motive is inferred) for an act's consequences." *Burnett v. Griffith,* 769 S.W.2d 780, 787 (Mo. banc 1989). *See also Boyer v. Grandview Manor Care Center, Inc.,* 805 S.W.2d 187, 190 (Mo.App.1991) (citing *Burnett* for standard to instruct on punitive damages in a tortious interference case, but not applying the standard because the issue was not preserved on appeal). "It is not so much the commission of the intentional tort as the conduct or motives – the defendant's state of mind which prompted its commission that form the basis for a punitive damage award." *Burnett,* 769 S.W.2d at 787 (citing W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, § 2, at 9–10 (5th ed.1984)). The conduct itself is " 'outrageous[ ] because of defendant's evil motive or reckless indifference to the rights of others.' " *Burnett,* 769 S.W.2d at 789 (quoting Restatement (Second) of Torts § 908(2) (1977)). The plaintiff has made a submissible case for punitive damages if the evidence and the inferences drawn therefrom are "sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity—that is, that it was highly probable—that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Lopez–Vizcaino v. Action Bail Bonds, Inc.,* 3 S.W.3d 891, 893 (Mo.App.1999).

■ Reviewing the record in the light most favorable to Fabricor, DuPont committed a series of acts that are sufficient evidence of its evil motive toward Fabricor for the trial court to submit the issue of punitive damages to the jury. The first such act was DuPont's letter to BMS regarding what would happen if BMS continued to supply Fabricor. Without a basis in fact, DuPont wrongly told BMS that if BMS supplied Fabricor, BMS would have

to provide "showroom display discounts, Yellow Pages costs, professional choice training, advertising, [and] literature and samples . . ." in the area in which Fabricor was located. These representations by DuPont to BMS were false. Because Fabricor was out of the BMS distribution area, BMS had been paying a ten percent passover fee for each sale of Corian® to Fabricor to reimburse Colt Industries (the distributor who covered the region in which Fabricor was located) for providing these services. Such use of intentional misrepresentations has been found to be sufficient evidence of evil motive to submit the issue of punitive damages to the jury. *See Carpenter v. Chrysler Corp.,* 853 S.W.2d 346, 364 (Mo.App.1993) (defendant withheld information and made false representations to induce sale of automobile to plaintiff held sufficient evidence from which jury could reasonably infer that defendant's actions were taken with reckless disregard or with an evil motive).

DuPont's next acts which are indicative of its evil motive occurred during the KCI Marriott project. When Mr. Harris called DuPont in an attempt to assist Fabricor in obtaining a supply of Corian® for the project, DuPont told Harris Sales that DuPont did "not choose to do business with Fabricor; why don't you go to another one of our certified fabricators," even though Fabricor was an official DuPont certified fabricator. When Marriott asked DuPont why Fabricor, as a certified fabricator, was not being supplied the needed material, DuPont told Marriott that there would be no problem if Marriott would just use a different fabricator. Additionally, DuPont told Marriott that the reason why Fabricor could not receive a supply of the material was because Fabricor owed money to the distributor.[4] However, Fabricor did not

---

4. DuPont argues that any misrepresentation it may have made to Marriott at this time was not evidence of outrageous conduct since DuPont corrected the misrepresentation in the March 19, 1993 letter written by Paul Clegg, a DuPont employee, to Marriott. However, if

there was an attempt to correct DuPont's misstatement through Mr. Clegg's letter, it was not sufficient to inform Marriott that a correction was being made. While DuPont mentions in the letter that Fabricor had experienced credit problems at an earlier time, no

owe money to Colt at that time, nor did Fabricor have financial problems with BMS, another distributor, which would have prevented Fabricor from obtaining the supply of Corian® necessary for the KCI Marriott project from BMS.

After the KCI Marriott project, DuPont continued to misrepresent to Marriott that Fabricor lacked the financial ability to perform, even though Fabricor had demonstrated its ability to perform by meeting all deadlines set by Marriott. As cited above, intentional misrepresentations can be a sufficient basis for a jury to infer an evil motive. All of these acts demonstrate DuPont's efforts to convince Marriott not to do business with Fabricor even though Fabricor remained a DuPont certified fabricator. The jury could reasonably infer that DuPont harbored some type of ill will towards Fabricor.

▮ In addition to these acts which demonstrate both DuPont's tortious interference and its evil motive, there was other evidence which demonstrates DuPont's evil motive. Such evidence can be considered with regard to the issue of punitive damages if the acts "show defendant's disposition, intention, or motive in the commission of the particular acts for which damages are claimed." *Charles F. Curry & Co. v. Hedrick,* 378 S.W.2d 522, 536 (Mo.1964). One such act that shows DuPont's wanton, willful nature is found in a memorandum circulated between two DuPont employees. Robert Wheatley, a DuPont manager, wrote to his supervisor, William Fleming, asking if there was a legal way that DuPont could advise its entire distribution network that DuPont did not want Mr. Summers to fabricate Corian® again. DuPont would have the court and jury believe that this memorandum resulted from quality concerns DuPont had regarding Fabricor's work. The evidence showed, howev-

er, that the quality concerns raised were primarily the result of poor installation by the contractor, not Fabricor. This evidence demonstrates DuPont's desire to keep Fabricor from fabricating Corian® for Marriott or any contractor. The jury could reasonably infer that this memorandum shows DuPont's evil motive and a reckless disregard by DuPont for the consequences this memorandum would have on Fabricor.

The behavior by DuPont is comparable to that found in other cases in which courts have held that the plaintiff made a submissible case for punitive damages. These cases involve evidence in which the defendant committed repeated bad acts from which the jury could find willful or outrageous conduct by the defendant. For instance, in *DeLong v. Hilltop Lincoln–Mercury, Inc.,* the court found no error in submitting the issue of punitive damages where evidence demonstrated a "culpable mental state or reckless disregard for an act's consequences." 812 S.W.2d 834, 841 (Mo.App.1991). The defendant in *DeLong* repeatedly made false representations to customers concerning previous ownership of automobiles, refused to provide information despite the ease of doing so, and refused to repurchase the automobiles upon plaintiff's discovery of true prior ownership. *Id.* Similarly, in *Northland Ins. Co. v. Chet's Tow Service, Inc.,* evidence was introduced that the defendant lied about its charges, changed the amount due, refused payment and attempted to double bill. 804 S.W.2d 54, 57 (Mo.App. 1991). The court found this evidence sufficient to demonstrate an evil motive and that the trial court had not made an error in submitting the issue of punitive damages to the jury. *Id.*

In this case, there is sufficient evidence demonstrating that DuPont committed several different acts from which the jury

mention was made that this statement corrected DuPont's earlier statement that Fabricor owed Colt money. It is reasonable for the jury to infer that Marriott believed both statements were true and to infer that the misrep-

resentation by DuPont demonstrated ill will. To be sufficient to act as a correction, the statement would need to alert the reader that a correction was being made and what exactly was being corrected.

could reasonably infer an evil motive. After Colt had notified Fabricor it would no longer supply Fabricor, DuPont attempted to convince BMS, Fabricor's other major supplier, not to supply Corian® to Fabricor by making misrepresentations to BMS regarding the consequences BMS faced if it continued to supply Fabricor. Additionally, DuPont made it known that it did not want anyone to do business with Fabricor, made false representations on several different occasions over a period of several months concerning Fabricor's financial ability to perform for Marriott, and sought a way to prevent Fabricor from obtaining a supply of Corian® from any distributor in the nation. This is sufficient evidence to submit the issue of punitive damages to the jury. DuPont's third point on appeal is denied.

### 2. The Trial Court Applied the Incorrect Standard for Punitive Damages

■ DuPont's final point raises the issue of what standard of proof the trial court must instruct the jury on for punitive damages. DuPont argues that the court must be guided by the case of *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. banc 1996), in which the Supreme Court changed the standard of proof regarding punitive damages from preponderance of the evidence to clear and convincing evidence. Fabricor responds that the trial court was correct in instructing the jury that the burden of proof was the preponderance of the evidence standard because the Supreme Court had not yet decided *Rodriguez* at the conclusion of the trial in this case.

In *Rodriguez,* the Supreme Court established a new standard of proof for punitive damages. The Supreme Court found, "[b]ecause punitive damages are extraordinary and harsh, this Court concludes that a higher standard of proof is required: For common law punitive damage claims, the evidence must meet the clear and convincing standard of proof." *Id.* at 111.

The Court stated that application of the new standard applied "to [the *Rodriguez* ] case, all cases in which trial begins after February 1, 1997, and all pending cases in which the instructional error has been preserved." *Id.*

The Supreme Court's directive in *Rodriguez* seems clear that the new standard of proof is to apply to all pending cases. However, Fabricor argues that the Supreme Court intended for *Rodriguez* to apply only prospectively since the change was procedural in nature. The Eastern District considered the application of *Rodriguez* in *Cole v. Goodyear Tire & Rubber Co.,* 967 S.W.2d 176, 186–87 (Mo.App. 1998). In that case, the trial court instructed the jury that the burden of proof regarding punitive damages was by the preponderance of the evidence over the objection of Goodyear that the standard should be clear and convincing. *Id. Rodriguez* was decided before the trial court ruled on the motion for new trial. *Id.* at 187. On appeal, the Eastern District found that the case was still pending and that the issue had been preserved for appeal. *Id.* Given the directive in *Rodriguez,* the court ruled that the case had to be reversed. *Id.*

This case was pending at the time *Rodriguez* was decided because it had not yet been reduced to a final, unappealable judgment. *See State ex rel. Faith Hosp. v. Enright,* 706 S.W.2d 852, 854 (Mo. banc 1986). Additionally, DuPont preserved the issue. To preserve claims of instructional error for review, counsel must make specific objections to the instruction at trial and raise the error in the motion for new trial. Rule 70.03. At trial, DuPont made a specific objection by stating, "[the] instruction does not require the jury to find that … the evidence is clear and convincing with respect to the punitive instruction." Additionally, DuPont raised the issue in its motion for new trial. Therefore, DuPont preserved the issue for appeal. Pursuant to the directive of *Rodriquez,*

this court reverses Fabricor's judgment against DuPont for punitive damages.

Fabricor has made a submissible case with regard to punitive damages. However, it is for the "trier of fact to decide whether the evidence is credible, even in view of contrary evidence, and whether the ... party has met its burden." *South Side Nat. Bank in St. Louis v. Winfield Financial Services Corp.*, 783 S.W.2d 140, 143 (Mo.App.1989). Given that the trial court submitted this issue under the wrong burden of proof standard, the case must be remanded for a new trial with regard to the issue of punitive damages.

## IV. Colt's Appeal

### Fabricor Failed to Make a Submissible Case of Tortious Interference Against Colt

At trial, Fabricor argued that Colt interfered with its relationship with DuPont by canceling its sponsorship of Fabricor for the CF/I program or not recommending Fabricor for renewal, and by informing DuPont of alleged deficiencies in Fabricor's payment record and misrepresenting the quality of its fabrication. As Colt's first claim on appeal, it contends that the trial court erred by refusing to grant a directed verdict in its favor because Fabricor failed to offer substantial evidence that it had a reasonable business expectancy that its CF/I agreement would be renewed, that Colt intentionally caused the agreement not to be renewed, and that Colt acted without justification.

Viewed in the light most favorable to the plaintiff Fabricor, the evidence showed that Fabricor had been a CF/I for DuPont Corian® since 1989. In 1991, Fabricor entered into its final CF/I agreement with DuPont, which would end by its own terms after two years had elapsed. Colt was not obligated under the CF/I agreement between Fabricor and DuPont. Colt was not a party to the 1991 CF/I agreement and there was no policy or provision in the agreement requiring Colt to continue business relations with Fabricor or continue as Fabricor's sponsor.

Under the CF/I agreement between DuPont and Fabricor, Fabricor was required to maintain a good financial relationship with its distributor, Colt. During their course of doing business, Colt experienced problems with Fabricor being past due on accounts. Despite warnings from Colt, Fabricor did not pay its account according to the terms established by Colt. In 1992, Colt ceased conducting business with Fabricor. While Colt had previously sponsored Fabricor to be a certified fabricator and installer, and had previously conducted business with Fabricor, Colt was not required by law to continue. *See Central Bank of Lake of the Ozarks v. Shackleford*, 896 S.W.2d 948, 956 (Mo.App.1995). *See also*, RESTATEMENT (SECOND) OF TORTS § 766, cmt. l (1977); PROSSER AND KEETON ON THE LAW OF TORTS, § 130, at 1024.

The fact that Colt experienced difficulties with other fabricators with whom it chose to continue business relations is irrelevant. "[P]ersons are free to deal or refuse to deal for any reason, or even for no reason at all, so long as they do not induce others to join in boycott activities." PROSSER AND KEETON ON THE LAW OF TORTS § 130, at 1024. "A party is ordinarily free to refuse to deal with [another] for any or no reason." RESTATEMENT (SECOND) OF TORTS § 766, cmt. l. (1977). "The mere refusal to deal with a party cannot support a claim for tortious interference with contractual relations." *Central Bank*, 896 S.W.2d at 956 (quoting *Quintana v. First Interstate Bank of Albuquerque*, 105 N.M. 784, 737 P.2d 896 (1987)).

Fabricor elicited evidence at trial that DuPont required its CF/Is be sponsored by the distributor in the geographical area in which the fabricator was located and the only distributor for Fabricor's area was Colt. Fabricor relied on this evidence in arguing that Colt tortiously interfered with the relationship between DuPont and Fabricor. "A party is bound on appeal by the position such party took in the trial

court." *Tharp v. Keeter/Schaefer Investments, L.P.,* 943 S.W.2d 811, 816 (Mo.App. 1997). Although DuPont's usual practice was to automatically renew CF/I agreements, since Fabricor no longer had a sponsoring distributor, Fabricor did not qualify to have its CF/I agreement renewed after Colt terminated their business arrangement.

The decision of DuPont not to renew Fabricor's CF/I agreement was a consequence of Colt exercising its unqualified legal right not to do business with Fabricor. Once Colt terminated its business dealings with Fabricor, Fabricor no longer had a reasonable business expectancy that DuPont would renew its CF/I agreement. Therefore, Fabricor failed to present evidence of an essential element of its tortious interference claim.

Because Fabricor has not sustained its burden of producing substantial evidence for every element of its claim of tortious interference, the claim should not have been submitted to the jury. Therefore, this court finds that the trial court erred in denying Colt's motion for judgment notwithstanding the verdict. Although "[w]here a party asserting a claim prevails in the trial court and an appellate court reverses because of insufficient evidence, the preference is for remand for a new trial," remand is not required if "the appellate court is persuaded [that] the claimant cannot make a submissible case on retrial." *Central Bank,* 896 S.W.2d at 957. Reviewing this case, this court concludes that over the course of the two-week trial, Fabricor presented all available evidence in support of its claim against Colt and cannot produce additional evidence sufficient to make a submissible case of tortious interference on retrial. *See id.* Therefore, remand is unwarranted and the trial court's ruling is reversed.

Because this court's ruling with regard to Colt's first point on appeal disposes of the remaining issues presented, they will not be addressed.

## V. Conclusion

The judgment against Colt is reversed outright. The judgment against DuPont for liability and actual damages is affirmed. The judgment for punitive damages against DuPont is reversed and remanded for a new trial on the issue of punitive damages only. *Burnett,* 769 S.W.2d at 791. On remand, the trial court shall retry the punitive damages issue against DuPont under the clear and convincing standard of proof.

The judgment of the trial court is reversed in part, affirmed in part and remanded.

All concur.